STATE, RESPONDENT, *v.* CASSILL ET AL., APPELLANTS.

(No. 5,385.)

(Submitted April 23, 1924.  Decided May 19, 1924.)

[227 Pac. 49.]

*Criminal Law—Banks and Banking—False Reports—Evidence
—Admissibility and Inadmissibility—Trial—Penalty—Statute
Controlling.*

Banks and Banking—Making False Reports—Acts Constituting Offense
Occurring in Two Counties—Jurisdiction.
　　1.  Under the rule declared by section 11707, Revised Codes of 1921,
that where the acts constituting or requisite to the consummation of
an offense occurred in two counties, trial may be had in either, *held*
that where defendants, president and cashier of a bank, prepared an
alleged false report to the superintendent of banks in P. county and
transmitted it by mail to the superintendent in L. & C. county, the
district court of the former county had jurisdiction.

Criminal Law—Evidence of Other Like Acts—Admissibility.
　　2.  In a criminal prosecution evidence of other acts of like nature
is admissible to prove a uniform plan or course of action on the
part of the accused for the purpose of disclosing his motive, guilty
knowledge or criminal intent, or to negative the idea that the par-
ticular offense complained of was the result of mere inadvertence,
accident or mistake, and if such evidence also tends to establish the
commission of another offense, it is not for that reason inadmissible.

Banks and Banking—Officer Making False Report—Evidence of Other
Like Acts Admissible.
　　3.  For the purpose of showing the motives, guilty knowledge or
criminal intent of an officer of a bank accused of making a false
report to the superintendent of banks, evidence of prior false reports
made by him at a time not too remote from the one under inquiry
is relevant, material and competent.

---

3.  Evidence of other crimes to show intent, see notes in 62 L. R. A.
214; 42 L. R. A. (n. s.) 668, 755, 774, 778.

Same—Evidence—Admissibility.

4. Since, in view of the fact that the books of a bank and an alleged false report of its condition corresponded, it was necessary for the state to show that false entries had been made in the books which were the basis of the report, it was competent to show that an alleged deposit with one of the bank's correspondents did not exist.

Same—Admission of Evidence of Other Like Acts—Duty of Court to Admonish Jury.

5. Where testimony is admitted with respect to the commission of acts similar to the one with which defendant stands charged, proper practice requires that the court admonish the jury that it is admitted for the purpose only of showing knowledge and intent in defendant, and give an appropriate instruction covering the subject.

Same—Sheets from Loose-leaf Ledger—When Admissible in Evidence.

6. Sheets from a loose-leaf ledger of a bank, a book of original entry, kept in the ordinary course of business, were properly admitted in evidence upon identification by its president who was fully qualified to speak with respect thereto by his thorough knowledge of the method of bookkeeping employed, his supervision over his subordinate officers and his familiarity with the books as kept.

Same—Entries in Bank-books—Explanations by Expert Witness Proper.

7. Explanations of the meaning of various entries in bank-books by expert accountants on the witness-stand are permissible and not objectionable as conclusions.

Same—Offer of Bank to Lend Money to Defendant's Bank not Justification for Making False Report—Evidence—Proper Exclusion.

8. An offer of proof that the president of one of the correspondents of defendants' bank had advised them that his bank was ready and willing to lend their bank the sum of $10,000 at any time and that the offer was never withdrawn or revoked was properly excluded, the mere offer to lend having been no justification for entry of that sum on the bank's books as having been received and making report thereof to the superintendent of banks.

Same—Negotiating Loans from Other Banks—Entry as Asset Before Approval of Loan—Custom—Proper Exclusion.

9. In a prosecution against the official of a bank for making a false report to the superintendent of banks, testimony that when a country bank negotiates a loan from another bank, it is customary for the former to enter it as an asset when the collateral or other security is transmitted without awaiting notice of the receipt of the security or the approval of the loan, was properly excluded, the mere transmittal of securities to another bank not justifying a representation that the credit actually existed.

Same—Evidence of Percentage of Collateral Required for Loan—Proper Exclusion.

10. Testimony as to the percentage of collateral required to secure a loan in a certain year as compared with previous years offered for the purpose of showing absence of criminal intent in defendants in attempting to secure a loan from another bank was properly excluded as irrelevant in a prosecution for reporting a loan as an asset which had merely been applied for but not accepted at the time the report was made.

---

5. Effect of form and construction of books of account on admissibility in evidence, see note in 52 L. R. A. 572.

[70 Mont. 433.]

Same—Cross-examination of Defendant—Latitude.

11. Where defendant accused of crime becomes a witness in his own behalf and in his direct examination is accorded a wide latitude, the same latitude should be accorded to the state in its cross-examination to the end that the whole truth concerning the matter brought forward by the witness may be shown.

Same—Cross-examination—When Court may Limit.

12. Where on cross-examination of a witness every material and proper question was answered and the ground upon every point covered fully, the district court may, under section 10661, Revised Codes, stop the production of further evidence upon the subject.

Same—Trial—Rulings upon Evidence—Judge may State Reasons.

13. It is the duty of the trial judge to confine the trial of a criminal cause within the issues to keep from the jury extraneous matters likely to mislead them, and to cause the trial to proceed with reasonable expedition; and in ruling upon the admissibility of evidence he may with propriety briefly give the reasons for his action, provided he does not indicate by word or manner his bias for or prejudice against the state or the defendant.

Same—Penalty—Statute Controlling.

14. *Held,* that in a prosecution against bank officials for making false reports of the bank's financial condition to the superintendent of banks, under Chapter 89, Laws of 1915 (secs. 6014–6109, Rev. Codes 1921), section 58 (6077) prescribing as the penalty imprisonment for a term of not less than one nor more than ten years, and not section 63 (6082) fixing the penalty for a like offense at imprisonment for not more than five years, is controlling.

*Appeal from District Court, Powell County; George B. Winston, Judge.*

C. H. and SCOTT K. CASSILL were convicted of making false statements to the superintendent of banks and appeal. Affirmed.

*Mr. C. A. Spaulding,* for Appellant, submitted a brief, and one in reply to that of Respondent and argued the cause orally.

*Mr. Wellington D. Rankin,* Attorney General, *Mr. L. V. Ketter,* Assistant Attorney General, *Mr. E. J. Cummins,* County Attorney of Powell County, and *Mr. S. P. Wilson,* for the State, submitted an original and a supplemental brief; *Mr. Cummins* and *Mr. Wilson* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The defendants C. H. Cassill and Scott K. Cassill were charged with having made false statements to the superinten-

dent of banks concerning the actual financial condition and affairs of the First State Bank of Ovando, of which they were, respectively, president and cashier, in a report submitted to that officer. The report was made upon a prescribed form, pursuant to a call from the superintendent of banks, and purported to show in detail the resources and liabilities of the bank at the close of business on April 28, 1921. It was made up and verified at Ovando, in Powell county, on May 3, 1921, and transmitted by mail to the superintendent of banks at Helena, who received it on May 7, 1921. The information charges that the defendants made false statements in the report as follows: They represented therein (1) that among the assets of the bank there was due from reserve banks to the Ovando bank the sum of $10,364.12, while in fact at the time referred to in the report there was no greater sum due the Ovando bank from reserve banks than $364.12; (2) that the bank had a cash reserve of $10,364.12, but in fact it had a cash reserve of only $364.12; (3) that the Ovando bank had among its assets property or representatives of value, consisting of "redemption, taxes, interest, and expenses" of the value of $5,874, while in fact at the time referred to in the report the bank did not have any such asset of any value or amount whatever; (4) that among its assets the bank had an item consisting of real property which constituted an asset in the sum of $9,250, of the estimated actual value of $15,400, and that the same had been purchased by the bank on the twentieth day of July, 1918, while in fact the bank did not have any such asset or similar asset; that prior to the making of the report defendants had caused a deed of said real estate to be executed purporting to convey the same to the bank, but the title was subject to a prior mortgage or lien in excess of $9,000 and the land had no value in excess of the prior mortgage and the same did not constitute an asset of the bank in any amount whatever. The information charges that these statements contained in the

report were each and all false and were made with the felonious intent to deceive the superintendent of banks.

To the information the defendants pleaded not guilty and in due time a trial resulted in their conviction. This was in October, 1921. Notice of appeal from the judgment was filed in November, 1921. By orders of the district court and of justices of this court the time for preparing and serving a bill of exceptions in behalf of the defendants was extended to the first day of August, 1923. The bill actually was settled on the 27th of July, 1923.

The transcript was filed in this court on the twenty-fourth day of August, 1923. The record does not show the cause for this long delay in perfecting the appeal, but from affidavits which are on file here wherein the defendants repeatedly made application to justices of this court for additional time in which to prepare their bill of exceptions it is made to appear that they were unable to procure the transcript of the evidence from the official stenographer who took the testimony at the trial. It was represented that by reason of the pressure of other duties the stenographer was unable to transcribe the evidence. If seasonable application had been made to this court a writ of *mandamus* would have issued directing the official stenographer to get out that transcript forthwith. The defendants had been convicted of a felony, had appealed to this court and were entitled to a speedy hearing. The transcript, with the exhibits and certificates, consisted of 728 pages of testimony and 37 pages of judgment-roll. This could have been gotten out within a few weeks at most. Delays of this sort are unpardonable, and in future will not be tolerated. We trust this warning will be heeded.

In order to facilitate a hearing and by reason of the poverty of the defendants we permitted a typewritten transcript to be filed. By consent of counsel we extended the time for filing briefs. Defendants' brief was filed on January 26, 1924; the state's on April 21. Counsel for defendants makes 236 assign-

ments of error, but these have been argued under several general heads.

1. Defendants contend that the district court of Powell [1] county did not have jurisdiction to try them. The trial, they say, should have been had in Lewis and Clark county, where the offense charged was consummated. Their counsel says: "It would seem, on principle, that if the delivery of this report to the banking department at Helena was an essential ingredient of the offense, then until such delivery there was no consummated making to the banking department of a false statement or report" and he urges that if the report had been lost in the mails no one rightly could contend the offense had been consummated. These arguments may be conceded but they are of no avail to defendants.

Section 11707, Revised Codes of 1921, says: "When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county."

The acts constituting or requisite to the consummation of the offense charged here occurred in two counties, and trial might have been had in either. This case presents a clear illustration of the application of section 11707. Citation of authority would seem to be unnecessary, but see *State* v. *Mason,* 61 Kan. 102, 58 Pac. 978. Counsel relies upon *State* v. *Hudson,* 13 Mont. 112, 19 L. R. A. 775, 32 Pac. 413. The facts in that case were that the defendant forged an instrument in Gallatin county and mailed it to Silver Bow county where it was delivered and acted upon. He was charged with uttering, publishing and passing a false and forged instrument in Gallatin county. The uttering was the offense. The court held that the instrument was not uttered until it reached the destination intended, and said: "The acts or effects requisite to the consummation of the offense were not committed in Gallatin county." In the instant case the making was the offense. A

number of acts entered into the making, one of which was transmitting the report to the superintendent of banks. The inapplicability of the *Hudson Case* is clear without further comment.

2. By the call the defendants were required to inform the superintendent of banks fully of the actual financial condition and affairs of the bank as of date April 28, 1921. The report was fair on its face. It told him that on that date the Ovando bank had on deposit with approved reserve agents money available to its immediate demand in the sum of $10,364.12, and also that it had that amount of cash reserve. The representation was that $10,276.05 was on deposit in the Northwestern National Bank of Minneapolis. Entries on the Ovando bank's books indicated the same thing.

In view of the allegations of the information, to prove its [2] case it was incumbent upon the state to show the falsity of the report in the particulars specified; to do that it was necessary to show the facts independently of the books, for the books and the report were found to correspond; falsity of the report being shown it was important to inquire whether the defendants made the statements in any manner consistent with an honest purpose, or feloniously. So in order to prove their case against the defendants, counsel for the state essayed to show the falsity of the report and that it was made with a felonious intent. For the purpose of showing such intent they were permitted to prove acts of the defendants tending to show that a similar course of conduct had been carried on during the entire year preceding the making of the report upon which the information is based. It is upon this phase of the case that counsel for defendants has based his chief attack upon the validity of the judgment.

The rule, not questioned, is that evidence of other acts of a like nature is admissible to prove a uniform plan or course of action on part of the accused for the purpose of disclosing his motive, guilty knowledge or criminal intent, or to negative

the idea that the particular offense complained of was the result of mere inadvertence, accident or mistake; and if such evidence also tends to establish the commission of another offense it is not for that reason inadmissible. (*State* v. *Wyman,* 56 Mont. 600, 186 Pac. 1; *State* v. *Pippi,* 59 Mont. 116, 195 Pac. 556.) But counsel contends that palpable errors were committed by the court in admitting proof of what he terms are other offenses "wholly unrelated to the matter charged in the information."

And now to the facts. For a long time the Ovando bank had been sorely in need of funds. During the latter part of April, 1921, its reserve was less than three per cent, and by law it should not have been allowed to fall below ten per cent (Sess. Laws 1921, Chap. 94). So the defendants conceived a plan to obtain the much needed credit, and this was the way of it. On April 28, 1921, they drew up two promissory notes for $5,000 each in favor of the Ovando bank, dated on that day, which they signed themselves. By representing to four of their fellow-directors that the bank needed $10,000, they induced these directors also to sign the notes to enable the bank to borrow the money. The other directors signed the notes not earlier than the 1st or 2d of May. But without waiting for the signatures of the others and before taking up the subject with the Northwestern National Bank the defendants, on April 28, 1921, made an entry in the Ovando bank's books which purported that the Ovando bank then had on deposit with the Northwestern the sum of $10,000; the Ovando bank then charged the Northwestern with that sum of money. This apparently gave the Ovando bank a cash reserve of seventeen per cent. At the same time C. H. Cassill took out from the assets of the Ovando bank the Holland notes aggregating $6,500, a note of the defendant Scott K. Cassill of the face value of $2,850, and $650 in cash. The $6,500 notes he placed as collateral to a $3,700 note which he owed the bank personally,

gave the $2,850 note to Scott K. Cassill, its maker, and the $650 he deposited in his personal account.

The Northwestern was the Ovando bank's correspondent at Minneapolis. As early as March 20, 1921, C. H. Cassill had appealed to that bank by telegram for a loan of $5,000. The next day the Northwestern answered that it would loan the Ovando bank that much money on the basis of "two for one collateral and guaranty of directors." So far as the record discloses, nothing resulted from the two telegrams. But on May 2 C. H. Cassill wrote a letter to the Northwestern with which he transmitted the two $5,000 notes, with statements purporting to show the property owned by the signers, and in this letter he said: "I am going to ask you, if it is possible for you to do so, to discount these notes for us, and give us credit for same. * * * " On May 7 the Northwestern declined to loan any money on the notes, demanding additional security. Correspondence was carried on between the parties for some time, in fact well into June, but the Northwestern did not at any time loan to the Ovando bank, nor credit it with, the sum of $10,000, nor any part of it. On April 28 the Ovando bank had on deposit with the Northwestern the sum of $276.05 only; yet when the defendants made out and verified the report on May 3 they represented that the Ovando bank had on deposit with the Northwestern the sum of $10,276.05.

This was not the first false report the defendants had made to the superintendent of banks concerning their bank's assets and cash reserve. Commencing with May 4, 1920, and continuing down to and including the report upon which the information is based, the defendants made similar false representations. As in investigating the truth of the report of April 28, 1921, so in these instances it was necessary to go beyond the books to ascertain the facts respecting the other reports. In these investigations the Holland notes play an important part. These notes, aggregating $6,500, were executed by C. E. Holland to the defendant C. H. Cassill. On March 5, 1920, he indorsed

them to the Ovando bank. In the report of May 4, 1920, the defendants represented that the Ovando bank had on deposit with the Iowa State Savings Bank of Sioux City, Iowa, hereafter referred to as the Iowa bank, the sum of $8,357.81. On April 30, 1920, the Ovando bank-books show an entry indicating that the Holland notes were rediscounted to the Iowa bank for $6,500. The Iowa bank was charged accordingly. This went to make up $6,500 of the $8,357.81. On May 7, 1920, the Iowa bank is credited with $6,500, marked "Holland discount," indicating that the Holland notes had been returned to the Ovando bank. The facts were that C. H. Cassill, on April 23, 1920, wrote to W. L. Montgomery, president of the Iowa bank, asking for a loan of $6,500 to run until November 1, and saying: "We will leave at least $5,000 of this with you to the credit of the First State Bank." On April 27, Montgomery wrote Cassill refusing to make the loan. He testified that the Iowa bank never did discount the Holland notes. Yet by the simple expedient of charging these notes to the Iowa bank, and later crediting that bank with them as upon their return, the defendants in their report to the superintendent of banks showed $6,500 as due from reserve banks and that amount of cash reserve—a showing purely fictitious and egregiously false.

The report of the Ovando bank under date of June 30, 1920, gives the amount due the Ovando bank from approved reserve agents as $8,395.63. Of this $6,857.81 was represented as due from the Iowa bank, The Ovando bank's records disclose a purported certificate of deposit for $5,000 in favor of the Iowa bank, signed by the defendant Scott K. Cassill, as cashier. As it is not pretended that the Iowa bank ever deposited any money with the Ovando bank, this certificate must have been written to represent money borrowed by the Ovando bank from the Iowa bank. But the witness Montgomery, who was president of the latter bank during the years 1919, 1920, and until March 1, 1921, testified that his bank never received this cer-

tificate of deposit nor did it make any corresponding loan to the Ovando bank.

Again in the report of September 8, 1920, the defendants represented the sum of $13,104.77 as due from approved reserve agents. Of this $11,857.81 was shown to be due from the Iowa bank. The Ovando bank's books show the issuance of a certificate of deposit for $10,000, purporting to have been issued August 28, 1920, to the Iowa bank, and that it was paid December 18, 1920. This also was fictitious. The Iowa bank never had any knowledge of this $10,000 certificate and as a matter of fact it never left the Ovando bank. This fictitious credit also appeared in the reports of September 9, November 15, and December 29, 1920, and February 21, 1921.

The state's testimony respecting divisions (3) and (4) above mentioned is somewhat interwoven. Both seem to be based upon what is called the Ponton land. Under the head of real estate in the report the Ponton land is listed as an asset in the sum of $9,250, with an estimated actual value of $15,400. Each report made to the superintendent of banks, beginning with that of September, 1920, contains the same representations as to this land. C. H. Cassill in February, 1919, became the owner of this land, agreeing to assume a $9,000 first mortgage thereon and some other liabilities connected therewith. On July 20, 1920, Cassill conveyed the land to the bank but the deed was not recorded until after the receiver found it among the bank's papers. On July 19, 1920, entries were made on the books of the bank showing the acquisition of the land and the payment to C. H. Cassill from the funds of the bank of the sum of $1,000, together with the Holland notes of $6,500 and another note of $1,750. But prior to this the bank had paid out considerable sums of money on account of the land. Under the head of "Other Resources" in the report, following the words "redemption, taxes, interest and expenses," appears the sum of $5,874, which appears to have been made up from the following items, all relating to the Ponton land: "Redemption

taxes," November 24, 1919, $75.24; redemption taxes and interest paid to Frank Brainard, who was the holder of the first mortgage, April 15, 1919, $1,120; another payment to Frank Brainard April 28, 1919, $98.80; amount paid for labor and materials January 7, 1920, $500; two interest payments of $540 each, and $3,000 deposited to the credit of C. H. Cassill January 23, 1920, the deposit slip showing "Ponton place $3,000" —total $5,874.04.

And yet these amounts were reckoned as assets of the bank. If the land had been of a value sufficient to warrant expenditures, the amounts might have been charged up against it as an asset, but under the conditions the credit item appears fictitious. The fact that C. H. Cassill at one time took from the bank's money $1,000 and at another time $3,000 on account of this land is worthy of note, to say the least. And here it is interesting to observe that the Holland notes which C. H. Cassill received from the bank in part payment for the Ponton land he turned to the bank again, within six months for $6,500 in cash. Ponton on his part testified all he received for the land was "a $3,000 second mortgage on the Hans Mengel place," and Cassill's promise to assume the first mortgage of $9,000, and some other items of expense.

The Ponton place consisted of 480 acres of land with improvements. The state produced witnesses who testified that the value of the land with improvements did not exceed $20 per acre. Based upon this testimony its value did not greatly exceed the amount of the first mortgage. To be sure, this testimony was controverted. But it is idle for counsel to contend that evidence tending to show the fictitious value of the items going to make up the $5,874 and respecting the value of this land was not proper and material to the inquiry.

Counsel for defendants insists that it was error for the court to admit in evidence the reports made by the defendants during the year preceding April 28, 1921. He argues that these were separate and distinct offenses and suggests that "it is doubtful,

to say the least, whether it was necessary for the state to show even inferentially that this report was furnished with any specific intent,'' in view of the provisions of section 6077, Revised Codes of 1921, under which the defendants were charged, by reason of the fact that the section provides that ''Every person authorized by the provisions of this Act to make statements or reports, who willfully and knowingly subscribes or makes any false statement or report, shall be deemed guilty of a felony.'' Considering the denunciations of the rulings of the trial court with which counsel has enlivened his brief, we can well imagine what he would have said had the court ruled that under the provisions of the section quoted it was not permissible for the defendants to show that they had made the report under conditions indicating honesty of purpose. But [3] the law is that for the purpose of showing the motives, guilty knowledge, or criminal intent of a defendant accused of making a false report to the superintendent of banks, prior false reports made by him, if made at a time not too remote from the one under inquiry, are relevant, material and competent. (*State* v. *O'Neil,* 24 Idaho, 582, 135 Pac. 60; *State* v. *Jackson,* 21 S. D. 494, 16 Ann. Cas. 87, 113 N. W. 880; *Anderson* v. *Commonwealth* (Ky.), 117 S. W. 364; *Galbreath* v. *United States,* 257 Fed. 648, 168 C. C. A. 598.)

Counsel argues strenuously that the court committed error [4] by permitting the state to show that false entries were made on the books of the bank in relation to the fictitious $10,-000 deposit with the Northwestern bank, but as we have said above, in order to show the falsity of the report it was necessary for the state to show that the basis upon which the report was made was false. Certainly it was competent to show that the alleged $10,000 deposit with the Northwestern bank did not exist.

He urges, also, that the court committed error in admitting evidence showing that C. H. Cassill took out $650 from the funds of the bank which he placed to his personal credit, that

he took out the Holland notes, and that he gave the note of Scott K. Cassill to that individual, this evidence, he says, tending to show three separate acts of embezzlement on the part of C. H. Cassill; also in admitting evidence tending to show that the defendants had falsified the records of the bank in showing that the Holland notes and Scott K. Cassill's notes had been paid; and also evidence that the defendants did not include the Scott K. Cassill note for $2,850 in the report as a liability of an officer of the bank. All of these acts, counsel says, constitute separate offenses not comprehended in the information. But all of these acts were shown to be a part of the very transaction carried out by the defendants when they received the two $5,000 notes as assets of the bank, which they entered upon the books as such, taking out the $650, the Holland and the Scott K. Cassill notes "to make the books balance"; and as a result of this series of acts creating on the Ovando bank's books the fictitious $10,000 credit, which they wrote into the report.

Likewise counsel urges that it was error for the court to permit the state to show the facts relating to the fictitious Iowa bank credits of $5,000 and $10,000. As it was competent for the state to show the falsity of such reports little further need be said as to these. The evidence tended to prove that all of the acts above mentioned were committed as a part of a general plan or scheme to show a false condition respecting the bank's affairs, as a basis for the false report. (*State* v. *O'Neil, supra.*) If the acts did tend to establish the commission of other offenses, it was not for that reason inadmissible. (*State* v. *Pippi, supra.*) All of these acts, viewed in the light of the surrounding circumstances, tended to show the motives which impelled and the intentions under which the defendants acted in making the report they did.

All of the other "unrelated offenses" of which defendants complain arose out of kindred facts, are governed by the same rules, and need not be separately considered.

Before leaving this branch of the case we call attention to
[5] the fact that at all times when testimony was admitted
with respect to similar acts the court appropriately admonished
the jury that the evidence was admitted for the purpose of
showing knowledge and intent, if any, on part of the defend-
ants and for that purpose only, and that the evidence should
be considered by the jury for that purpose only. The court
also gave to the jury an appropriate instruction covering the
subject. This was the correct practice. (*Spurr* v. *United
States*, 87 Fed. 701, 31 C. C. A. 202; *State* v. *Jackson, supra*.)

3. Over defendant's objection the court admitted in evidence
sheets from the original ledger kept by the Iowa bank, showing
[6] its account with the Ovando bank during a portion of
the period of time inquired about. This is assigned as error.
It is urged that Mr. Montgomery who identified the ledger
sheets and who was permitted to testify as to their correctness
was not competent to do so because he did not make the entries
himself and did not have actual personal knowledge of them.
It is not questioned that the sheets admitted in evidence were
what they purported to be—a portion of the ledger of the
Iowa bank. In view of the system of bookkeeping employed
they were practically sheets of original entry. The books were
kept in the ordinary course of business, and the entries were
made contemporaneously with the transactions of which they
spoke. Were the books kept correctly?

The Iowa bank was a modern institution. Besides the presi-
dent, vice-president and cashier, there were assistant cashiers,
bookkeepers, clerks and stenographers. The actual entries
shown upon the ledger sheets were made by the bookkeepers,
but if the bookkeepers were on the stand they could only testify
that the entries made by them were made correctly from data
furnished them by others in the due course of business. Who,
then, should have been produced to verify this ledger? Every-
body who had anything to do with these entries? That re-
quirement frequently would make impossible the use of the

books of any large commercial or industrial concern. A sufficient answer in such case should be that if the trial court is satisfied from the testimony of a supervising officer that the books offered in evidence are those of regular entry correctly kept in the ordinary course of business they should be admitted. The excellence and thoroughness of modern bookkeeping methods in banks, large mercantile establishments and business concerns generally are well known. This method of proving the books is in accordance with modern business requirements and we think when a proper foundation for its application is laid it affords a factor of safety quite equal to that recognized in *Ryan* v. *Dunphy*, 4 Mont. 356, 47 Am. Rep. 355, 5 Pac. 324, and *Meredith* v. *Roman*, 49 Mont. 204, 141 Pac. 643. The rule stated in those cases is still applicable to facts similar to those therein presented. As observed by Mr. Wigmore, "courts must cease to be pedantic, and endeavor to be practical." In volume 3 of his work on Evidence, section 1530, he recognizes the rule above stated as follows: "In such a case it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment; thus the production on the stand of a regiment of bookkeepers, salesmen, shipping clerks, teamsters, foremen, or other subordinate employees, should be dispensed with." (And see *Smith* v. *Sullivan*, 58 Mont. 77, 190 Pac. 288; *Continental National Bank* v. *First Nat. Bank*, 108 Tenn. 374, 68 S. W. 497; *Delaney* v. *Framingham, G. F. & P. Co.*, 202 Mass. 359, 88 N. E. 776; 10 R. C. L. 1179.)

Mr. Montgomery's testimony showing his thorough knowledge of the method of bookkeeping employed in his bank, his supervision over his subordinate officers, and his familiarity with the books as kept, fully qualified him to speak with respect thereto.

Complaint is made because some of the state witnesses who [7] were expert in accounting and bookkeeping were permitted to explain to the jury the meaning of various entries. The objection was that such statements were the conclusions of the

witnesses. But we have found the explanations illuminative
and useful and have no doubt they served to enlighten the
jury. There is no merit in the objection. (*Silver* v. *Eakins,*
55 Mont. 210, 175 Pac. 876; *State* v. *Brady,* 100 Iowa, 191, 62
Am. St. Rep. 560, 36 L. R. A. 693, 69 N. W. 290.)

4. The defendants offered to prove by the witness Mont-
gomery that he had told C. H. Cassill at a time prior to the at-
[8] tempt of Cassill to procure the $6,500 loan, that the Iowa
bank was ready and willing to loan the Ovando bank $10,000
at any time, and further that if the witness had been connected
with the Iowa bank in April, 1921, the $6,500 loan would have
been made. An objection to the offer was sustained. Later
on, while the defendants were presenting evidence in their own
behalf, they demanded that the state produce letters said to
have been written by the witness Montgomery to C. H. Cassill,
respecting the alleged $10,000 credit, giving notice of their
intention to introduce secondary evidence of the letters if the
same could not be produced. The letters were not produced,
counsel for the state denying any knowledge of them. When it
was attempted to prove their contents an objection to the
proffered evidence was sustained. Thereupon the defendants
offered to prove by C. H. Cassill, then on the stand, that in
the year 1919, in the month of December, he had correspon-
dence with Montgomery concerning the granting of credit by
the Iowa bank to the Ovando bank in the sum of $10,000; that
the witness wrote a letter to Montgomery in that month asking
if the Ovando bank could, "for reserve purposes," secure a
credit in that sum from the Iowa bank and that Montgomery
replied that the Ovando bank could have a credit "for reserve
purposes" at any time in the sum of $10,000, and the offer
was never revoked or withdrawn. An objection to this offer
of proof was likewise sustained. The court's rulings with
respect to these matters were correct. The meaning of the
phrase "for reserve purposes" was not explained. But the
mere showing that the Iowa bank was willing to loan the

Ovando bank money "at any time" would not have justified
the false entry made by the defendants. If bankers could
justify false entries made by them by the explanation that they
had friends who were ready and willing to deposit money when
called upon to do so, making reports to the superintendent of
banks might as well be done away with, for thus they might
always cover up or obscure the bank's true condition.

Furthermore, it was then in evidence and never denied that
in April, 1920, the defendant Cassill had requested a $6,50C
credit from Montgomery as president of the Iowa bank and the
latter had refused to make it. The $6,500 entry was made on
May 4, 1920, just following the refusal of Montgomery to loan
to the defendants that sum of money, as has been above ad-
verted to.

A number of errors are assigned upon the court's rulings
in different parts of the record respecting this so-called $10,-
000 credit and other matters directly cognate thereto. As it
was not permissible for the defendants to produce any evidence
respecting this purported arrangement in December, 1919, as
to a credit "for reserve purposes"—not founded upon any
consideration and for an indefinite period of time—it is un-
necessary to consider these specifications of error.

Defendants also offered to prove by Montgomery that he
[9]  knew from his experience as a banker that when a country
bank negotiates a loan from a reserve or other bank it is cus-
tomary for the country bank to enter the same as an asset
when the collateral or other security is transmitted and without
awaiting notice of the receipt of the security or the approval of
the loan. Objection to this offer was sustained. That the
court's ruling was correct would seem to be too clear to call
for discussion. In the first place, the defendants were called
upon to disclose to the superintendent of banks the actual con-
dition of the bank of which they were president and cashier.
If merely transmitting notes and securities to another bank
for credit would justify a representation that the credit existed,

designing bank officers might always be able to cover up the
actual condition of their bank and thus delude and deceive the
superintendent into the belief that the bank was sound when
the facts would show it to be like the Ovando bank—an empty
shell. The offer of proof was not germane to any fact in-
volved in the trial. If allowed it would have permitted a mere
expedition into the realm of pure speculation. Other offers of
proof were equally groundless.

Error is assigned because C. H. Cassill was not permitted to
[10] testify as to the percentage of collateral required to
secure loans in 1919, as compared with previous years. It is
said that this proof was relevant to indicate whether appellants
were impelled by criminal intent in what they did. But we
are unable to see any merit in this contention. The issue on
this phase of the case was whether the defendants had secured
the $10,000 loan from the Northwestern bank, which they had
represented under their oaths they had, or what was tanta-
mount to that. An answer to the question as to the amount of
collateral required would not have thrown any light whatso-
ever upon the matter.

5. Defendants' counsel insists that the court committed
error in allowing undue cross-examination of C. H. Cassill.
[11] But in the defendant's direct examination the court
had allowed his counsel a wide latitude. The witness was al-
lowed to explain at great length the factors which brought
about the failing condition of the Ovando bank. The weather,
crop, livestock, market and financial conditions were discussed
by this witness. He went into the condition of the bank ex-
haustively and gave explanations as to why the things done by
himself and son were done. The court properly permitted a
wide latitude in cross-examination. This court, speaking
through Mr. Commissioner Poorman, in *State* v. *Rogers,* 31
Mont. 1, 77 Pac. 293, used the following language, which is
applicable here: "It is a rule well established in this state that
when an accused becomes a witness in his own behalf, and

denies that he committed the crime for which he is on trial,
a wide latitude of cross-examination is permissible, owing to
the general nature of the defendant's statements. Upon the
cross-examination of such witness such deflections from the
matter brought out on direct examination are allowed as may
be necessary to bring the whole matter involved in the direct
examination before the court, and to extract the whole of the
truth concerning the matter brought forward by the accused.''
(Citing *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; and see
*State* v. *Rodgers,* 40 Mont. 248, 106 Pac. 3.)

But it is said that the court adopted a more restricted course
when ruling upon the cross-examination of the state's wit-
[12]  nesses. An examination of these assignments of error
does not bear out the assertion counsel makes. Here, too, wide
latitude was permitted in the cross-examination of the state's
witnesses. On occasion the examination extended to great
length. Many useless questions were asked and answered.
Every material and proper question put was answered. When
the ground has been covered fully upon a particular point,
the court has a right to stop the production of further evidence.
(Sec. 10661, Rev. Codes 1921; *State* v. *McConville,* 64 Mont.
302, 209 Pac. 987.)

6. The errors assigned under the head of ''Misconduct of
the Trial Court'' in defendants' brief have received careful
consideration. The five assignments argued under this head
relate to the trial judge's comments in the presence of the
jury during the examination of witnesses, including his remarks
bearing on an offer of proof which was denied.

It will not serve any useful purpose to enter into a particu-
[13]  lar discussion of these alleged errors. In view of the
conclusion reached with respect thereto, of the correctness of
which we have no doubt whatever, we shall content ourselves
with saying that while we do not approve of any of the com-
ments or remarks made by the judge which are complained of,
we do not find that any of them, or all of them considered to-

gether, worked prejudice to any substantial rights of the defendants, or probably could have done so. (*State* v. *Pippi*, *supra*.) As Mr. Justice Holloway remarked in the case last cited: "The presiding judge is not merely a monitor, but an important factor in the trial of every cause." It is his duty, while holding the scales of justice in even poise, to confine the trial within the issues properly triable, to keep from the jury extraneous matters likely to mislead them, and to cause the trial to proceed with all reasonable expedition, to the end that a correct result shall be attained. (*Rea* v. *Alfalfa Products Co.*, 53 Mont. 90, 161 Pac. 708.) In ruling upon the admissibility of evidence it is entirely proper for the judge to give briefly the reasons for his action, but it goes without saying that he should not indicate by his words or manner his bias for or prejudice against the state or the defendant. As was said by Mr. Chief Justice Brantly in *State* v. *Fuller*, 34 Mont. 12, 9 Ann. Cas. 648, 8 L. R. A. (n. s.) 762, 85 Pac. 369: "The judge should, during the course of the trial, refrain from remarks that are calculated in any way to influence the minds of the jury. \* \* \* Jurors have great confidence in and respect for the presiding judge, and are vigilant in their attention to whatever is said by him. He cannot be too careful in guarding his conduct in this regard."

7. Defendants assign four errors based upon instructions given and six upon instructions refused, and have advanced argument in support of the points made. A painstaking examination shows that the court instructed the jury fully, and as favorably as the defendants had a right to ask. It did not err in refusing to give any instructions offered by them.

But defendants insist that, while they did not make the objection upon the settlement of the instructions the court mis-[14] directed the jury with respect to the penalty which they might impose upon the defendants. The jury fixed the punishment of the defendant C. H. Cassill at not less than three nor more than six years, and of Scott K. Cassill at not less than one

nor more than three years, in the state's prison. Counsel asserts that the court erred in telling the jury that the punishment provided by law for the offense charged is not less than one nor more than ten years, the instruction being based upon section 6077, Revised Codes of 1921, while section 6082, Revised Codes of 1921, fixes as a penalty for the same offense imprisonment for a term not exceeding five years.

At first blush there would appear to be merit in this contention. An examination of the history of the legislation, however, brings the investigator necessarily to a conclusion contrary to the point made.

Sections 570 to 585, inclusive, of the 1895 Codes relate to banks and banking corporations. Section 577 was designed to regulate the declaration of dividends by the directors of banks, providing that when they declared a dividend the president or cashier should make a full and accurate statement to the state auditor of the condition of the bank upon the day the dividend was declared, *etc.* It was provided further that if the banking corporation should neglect to make out and transmit the statement required for one month beyond the period when it should have been made, "or willfully violates any of the provisions of this title," the directors should be personally liable for all debts of the corporation contracted previous to and during the period of such neglect and should also be subject to a penalty of not less than $100 nor more than $500.

In 1899 the sixth legislative assembly passed an Act relating to the dissolution, increase or decrease of capital stock of, and providing penalties for breaches of the banking laws by, banking associations, trust, deposit and security corporations and savings banks organized under the laws of this state. (Substitute for Senate Bill No. 87, Sess. Laws 1899, p. 109.) Section 2 thereof made provision as to what should be done by the governor, attorney general and state examiner when any of the corporations named in the Act should be found to be in an impaired or insolvent condition. In section 5 the corpora-

tions named were prohibited from accepting or receiving deposits of money, bank bills and the like, except under prescribed conditions.    This section was under consideration in the recent case of *In re Naegele, ante,* p. 129, 224 Pac. 269.    Section 6 of the Act prescribed penalties for transgressions of the acts prohibited by section 5, as well as for other acts, among these being the punishment of anyone who "willfully subscribes or makes false reports."

In 1905 the legislative assembly amended section 577, *supra,* by providing that each state bank and the other banking corporations therein mentioned should make to the state examiner not less than four reports during each year, according to the form prescribed by him, verified by the oath or affirmation of the president or cashier and attested by the signatures of at least two of the directors thereof, *etc.*    (Sess. Laws 1905, Chap. 19, p. 44.)    Other sections in the Act provided for the declaration of dividends, reports to the state examiner within ten days after declaring any dividend, respecting confidential information, providing a penalty for noncompliance with the Act, and section 6 thereof provided: "Every officer or other person authorized by this Act who willfully and knowingly makes any false statement of facts, statement of account or report, and every officer, agent or clerk of any such bank who willfully and knowingly makes any false entries in the books of such bank, or knowingly subscribes or exhibits false papers with the intent to deceive any person authorized to examine as to the condition of such bank, and every person authorized by the provisions of this Act to make statements or reports, who willfully and knowingly subscribes or makes any false statement or report, shall be deemed guilty of felony, and upon conviction, subject to imprisonment at hard labor in the state prison for a term not less than one nor more than ten years."

In 1915 the legislative assembly passed Chapter 89, an Act regulating the business of banking, providing for the creation and regulation of banking corporations, creating the department

of banking, *etc.*   (Laws 1915, p. 118.)   This Act in a measure was a compilation of previous Acts and in it were included portions of the Acts of 1899 and 1905.   Section 6 of the 1899 Act became 63, and section 6 of the 1905 Act became 58 of the 1915 Act.   If there had been any conflict in the penalty sections provided by the 1899 and 1905 Acts, the 1905 Act would have operated to repeal section 6 of the 1899 Act, at least in part.   However, in the 1915 compilation both sections were re-enacted, and it becomes unnecessary to discuss that question. All that it is necessary to do now is to determine what the legislature intended in re-enacting these sections.

It is clear that the 1905 Act related in the main to the subject of reports required to be made to the state examiner and that section 6 thereof had reference only to penalties for the infraction of the provisions of that Act.

By section 51 of the 1915 Act the state examiner is made *ex-officio* superintendent of banks.   Much of the substance of section 1 of the 1905 Act is comprehended in section 52 of the 1915 Act, now 6071, Revised Codes of 1921, while sections 3, 4, 5 and 6, without amendment except as to nomenclature, became sections 53, 56, 57 and 58 of the 1915 Act, now respectively, sections 6072, 6075, 6076 and 6077, Revised Codes of 1921.   Section 63 (6 of the 1899 Act) became 6082, Revised Codes of 1921.   Under this state of facts it is not necessary to consider whether there is any conflict between these sections. The sections of the 1905 Act having been carried along together into the 1915 Act, as is above related, leads to the inevitable conclusion that section 6, otherwise 58, was intended by the legislature to apply to its companion sections in the future as it had in the past.

It is suggested by counsel for the state that section 6082 applies only in connection with insolvent banks and has reference only to information in which the insolvency of the bank is an essential part of the charge.   This point we need not con-

sider. We are satisfied that section 6077 is applicable to the case at bar, and 6082 is not.

8. The result of our labors convinces us that there is not any prejudicial error in the case. Upon the face of the record the defendants were given a fair trial. They certainly had the utmost endeavors of zealous counsel. How many hundred objections there are in the record, we do not know. We have read the transcript carefully, some parts of it several times, and have given earnest consideration to all of the assignments of error which counsel have argued orally or in the exhaustive briefs presented. Those we have deemed worthy of discussion upon the state of the record are treated in the opinion. We do not see how the jury could have found any other verdict but that of guilty. The evidence discloses a flagrant course of criminal conduct on part of the defendants. C. H. Cassill was the main offender, but that Scott K. Cassill knowingly and willingly aided and abetted his father in feloniously making the false report upon which the information is based, is beyond any question whatever.

The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY, GALEN and STARK concur.

Rehearing denied July 1, 1924.