STATE, RESPONDENT, *v.* ARNOLD, APPELLANT.

(No. 6,417.)

(Submitted February 13, 1929. Decided March 18, 1929.)

[275 Pac. 757.]

350

Mr. *E. E. Fenton* and Mr. *Donald Campbell,* for Appellant, submitted a brief; Mr. *Campbell* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. S. R. Foot,* Assistant Attorney General, *Mr. F. F. Haynes,* County Attorney, and *Messrs. Gunn, Rasch, Hall & Gunn,* for the State, submitted a brief; *Mr. Haynes* argued the cause orally.

HONORABLE W. L. FORD, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, disqualified, delivered the opinion of the court.

The defendant, having been convicted of the crime of grand larceny, has appealed from the judgment of conviction and an order denying him a new trial. The defendant was charged jointly with one Vince Quinlan and one Andy Smart, and was granted a separate trial. The evidence upon the part of the state shows:

That in the month of July, 1927, Mary Johnson was the owner of between 75 and 80 head of cattle branded U Lazy D on the right shoulder, among which cattle were more than 40 head of yearling steers and heifers, which cattle during said month of July were on the public range about two miles from the Johnson ranch, which ranch is located about nineteen miles north of Forsyth. That on the seventeenth day of July, 1927, William Johnson, the husband of Mary Johnson, counted these cattle and found them all there. That on the twenty-fourth day of July, 1927, he again counted them, and

found that 31 head of the U Lazy D cattle and one branded JN Bar, belonging to his son, were missing, and that the missing cattle were "long yearlings." That one day, the latter part of July, Tom Gabel, Arnold, Smart, and Quinlan rode horseback from the Arnold ranch into Forsyth, where all but Gabel turned off toward the river bridge, and Gabel continued into town, from which place he returned to the ranch and again went in to Forsyth in his car after supper. As he was returning to the ranch about midnight on that day, and as he entered the lane leading from the Yellowstone Trail to the Arnold ranch, he discovered Arnold, Smart, and Quinlan driving a bunch of cattle. Arnold at that time rode back to see who it was, and, upon ascertaining this fact, said, "All right," and returned to the cattle. Gabel rode up to the bunkhouse while Arnold, Quinlan, and Smart put the cattle in the corral, and then returned to the bunkhouse. The next morning around 4 o'clock they all got up, and Arnold told Gabel to take the saddle-horses, and Arnold, Smart, and Quinlan took the cattle from the corrals, and Gabel kept in the lead of the cattle with the horses. They then started for the Sheep Creek camp or pasture, which is about 15 miles south of the Arnold home ranch, having 33 head of cattle with them.

During this trip Gabel would occasionally drop back and ride with the three defendants driving the cattle. On one of these occasions he asked Smart what brand was on the cattle, and Smart laughed, and Quinlan said, "Can't you read?" and he saw that the brand was U D on the right shoulder. They arrived at the Sheep Creek camp pasture at about 9:30 in the morning. Upon arriving there the cattle were put in a little pasture, the horses being put in the corral, and the four then had something to eat.

After eating, Arnold instructed Gabel to ride the big pasture and gather saddle-horses, which he did, returning to camp at about 4 in the afternoon. As he was leaving the camp in the morning, Smart and Quinlan were driving the cattle from the little pasture toward the corral, and Arnold was

riding toward them. Upon returning, he observed that the cattle had been in the corral and there were a lot of tracks therein, and also a fire still smoking a few feet from the corral. Neither the tracks in the corral nor the fire were present when he left that morning. The cattle were back in the camp pasture, and branding irons and ropes were lying near the fire. Arnold and Smart drove the cattle through a gate, and Gabel saw that (Arnold's) the Double O Bar brand, had been put on the left ribs of all except two, and that the right shoulder of the animals, where the U D had been, was cut and bleeding. Arnold and Smart at that time had some discussion as to where to turn the cattle, and Arnold decided to turn them loose in the big pasture. Gabel, Arnold, and Smart then returned to the camp; Arnold remarking, ''We didn't make a bad haul the other night.'' During the rest of July and August Gabel treated the mutilated U D cattle and fresh Double O Bar brands, and assisted in mutilating the earmarks on those animals which had not been previously mutilated, and assisted in butchering some of them at the Arnold slaughter-house, near his home ranch; Arnold always being present and assisting in the work.

Seventeen head of the U D cattle were found between November 1, 1927, and the last of that month, in and around the Arnold big pasture, three of them in the Thomas section within the Arnold big pasture owned by the defendant Arnold, with the brand worked over and Arnold's Double O Bar brand on the left ribs. On November 10, and after the arrest of Arnold, Sheriff Patterson secured a search-warrant, and in pursuance thereof searched the Arnold premises, and there found three hides that bore mutilated brands on the right shoulder, which had been apparently cut out, and the defendant's brand on the left ribs. The hides were found lying near the chute leading to the slaughter-house and in the open field. Evidence was introduced showing the larceny of other animals than those mentioned in the information, about the same time as the larceny of the cattle of which defendant was accused;

witness Gabel testifying that he assisted in the mutilation of some cattle branded K. C., and that Arnold asked him if he wanted one of them, and he said "it was all right with him," and Arnold placed Gabel's brand on the animal; the brands on the animals, other than the U D cattle, were mutilated in the same manner as the U D brand.

Counsel for the defendant assigns 56 specifications of error, but in his argument and brief groups them under 11 heads, and we will follow his arrangement in disposing of the alleged errors.

1. The defendant, prior to his trial, moved the court to suppress the three hides as testimony, upon the grounds that the alleged search-warrant under which the hides were found and secured was invalid, for the reason that the affidavit upon which it was issued did not disclose probable cause for its issuance, and also that the premises upon which said hides were found were not described in the warrant; he also objected to the admission of the hides in evidence upon the same grounds. As the evidence, at the hearing to suppress such testimony, disclosed that the hides were found in the open field of the defendant, the sheriff did not need a search-warrant to search such field; for the protection afforded by the constitutional guaranty extends only to the subject matter of the provision. Section 7, Article III, of our Constitution, provides: "The people shall be secure in their persons, papers, homes, and effects, from unreasonable searches and seizures"; and an open field is not embraced within any one of the above terms. (*State* v. *Ladue*, 73 Mont. 535, 237 Pac. 495; *Hester* v. *United States*, 265 U. S. 57, 68 L. Ed. 898, 44 Sup. Ct. Rep. 445; *Schnorenberg* v. *United States*, 23 Fed. (2d) 38; *Koth* v. *United States*, 16 Fed. (2d) 59; *State* v. *Lee*, 120 Or. 643, 253 Pac. 533; *Gilstrap* v. *State* (Okl. Cr. App.) 263 Pac. 155.) The court, therefore, did not commit error in refusing to suppress the testimony and admitting the hides in evidence.

2. The defendant moved for a change of venue, and after a hearing, at which affidavits were filed and oral testimony

taken, the court denied the motion. Counsel for defendant contend that the showing made by them entitled the defendant to a change of venue, and that the counter-affidavits and oral testimony on the part of the state consisted entirely of the opinions of the witnesses. It is true that a very large portion of the testimony on the part of the state consists of such opinions, and the same may be said of the testimony on behalf of the defendant; but we think that as a whole the showing made by the state sufficiently controverted the facts brought out in the defendant's case, and that the court did not abuse its discretion in denying the change of venue. (*State* **v.** *Davis*, 60 Mont. 426, 199 Pac. 421.)

3. The state produced a witness (Cauble) who testified that he saw the defendant and one Carolan in the big pasture one day in November, 1927, and positively identified the defendant; on his cross-examination he testified that he made a statement in the county attorney's office that he could possibly have been mistaken in Carolan and Andy Smart, but that he did not think he was mistaken; on redirect he was asked if he did not make a statement in the county attorney's office, in the presence of others, "that he could not be sure of the identification of these men," and he answered that he did not. Such evidence, on redirect, was at first objected to by counsel for the defendant, but the record shows they withdrew such objection. The state afterwards placed two witnesses on the stand, who testified, over objection by counsel for defendant, that Cauble made such statements. The defendant asserts that the effect of such testimony was the impeachment by the state, without any foundation, of its own witness.

It is manifest, that, after the withdrawal of the objection, there was no error in permitting the witness Cauble to testify that he did not make such statements; but we think that error was committed in thereafter permitting the two witnesses to testify that he did make such statements. While under section 10666, Revised Codes of 1921, a party may contradict his own witness by showing inconsistent statements, before this may

be done a showing must be made. (*State* v. *Richardson,* 63 Mont. 322, 207 Pac. 124; *State* v. *Bloor,* 20 Mont. 574, 52 Pac. 611.) However, the error was not prejudicial, as the evidence secured thereby was beneficial to the defendant, and a judgment will not be reversed merely because error was committed by the trial court, unless it is clear that the substantial rights of the defendant were prejudiced; nor will a reversal be ordered when the error committed resulted in the defendant's favor (*State* v. *Smart,* 81 Mont. 145, 262 Pac. 158), and this notwithstanding the defendant used the witness Cauble on a minor matter in his defense.

4. During the cross-examination of the witness Gabel, he testified that, while in the office of the county attorney on the 9th of November, he made a written statement for the county attorney as to what he knew about the case, and that he signed such statement; that he made a second statement to the county attorney at Livingston. Counsel for the defendant thereupon moved the court to compel the county attorney to furnish him with the statements, to enable counsel to further examine the witness, stating at the time that he had reason to believe, and did believe, that such documents contained statements at variance with the present testimony of the witness. Counsel for defendant also, more than five days before the trial, served notice upon the county attorney that such statements would be demanded at the conclusion of the direct examination of the witness Gabel. The court denied the motion and the defendant assigns the denial thereof as error.

There is no distinction, in principle, between this case and the case of *State* v. *Hall,* 55 Mont. 182, 175 Pac. 267, and the court did not commit error in denying the motion.

5. Under proper instructions to the jury, limiting the purpose thereof, the admissibility of evidence of other similar offenses is so well settled in this state that we do not deem it necessary to discuss the question in this case; suffice it to say there was no error committed in this instance in admitting evidence of the other larcenies (*State* v. *Hopkins,* 68 Mont.

504, 219 Pac. 1106; *State* v. *Cassill,* 70 Mont. 433, 227 Pac. 49; *State* v. *Cesar,* 27 Mont. 252, 232 Pac. 1109; *State* v. *Roop,* 73 Mont. 177, 235 Pac. 336; *State* v. *McCain,* 76 Mont. 351, 246 Pac. 956; *State* v. *Hughes,* 76 Mont. 421, 246 Pac. 959), and the fact that the court in its instructions ·limited the purpose of such testimony to the matter of "intent" only. was beneficial to the defendant..

6. Witness Gabel testified in his direct examination that ▇ in the forepart of November,' 1927, he had a conversation with the co-defendant Vince Quinlan, as follows: "He asked me if I knowed anything about some fellows up there gathering some cattle. I said, 'What cattle?' He said, 'Them U D cattle,' I said, 'No.' He said, 'Them fellows were out there, and we are bringing them cattle in and butcher them, and feeding them to the hogs as fast as we can, and what we can't if it gets too cold, we are shooting them in some coulees out there.' '' This evidence was admitted on the theory that it was a declaration of a co-conspirator, and defendant contends (1) there was no conspiracy shown; and (2) if there was a conspiracy, it had long since terminated.

"A conspiracy is constituted by an agreement, and is a partnership in criminal purposes. * * * While it is not essential that the agreement between the parties should be . formal, it is necessary that their minds meet understandingly, so as to bring about an intelligent and deliberate agreement to do the acts. * * * Of course, it is not indispensable that a conspiracy be proved by direct evidence. Circumstantial evidence is legal evidence, and, if sufficient, will establish the existence of a conspiracy." (*State* v. *Hopkins,* supra.)

From the statement of the facts and evidence herein, it is apparent that there is sufficient proof of a conspiracy between Arnold, Smart, and Quinlan to steal the U D cattle. On the 1st of November the officers commenced searching the big pasture for the cattle, and continued such search until the. latter part of the month. On the second day of November, Arnold was seen in the big pasture, and on the 10th of that

month three fresh hides from U D cattle were found by the sheriff near the slaughter-house of the defendant, among a number of horse hides. While these facts are not sufficient in themselves to prove a conspiracy, yet, the conspiracy to commit the larceny being shown by other evidence, they tend to show a subsequent concealment of the crime, and the carrying out of the very purpose of the conspiracy; therefore the above conversation was admissible. (*Byrd* v. *State*, 68 Ga. 661; *O'Neal* v. *State*, 14 Tex. 590; *State* v. *Garrett*, 71 Or. 298, 141 Pac. 1123; 16 C. J., par. 1318, p. 661.)

7. The viewing by the jury of the cattle involved herein ██ was a matter within the discretion of the trial court, and, as there is no fault found with the manner in which the viewing was conducted, we cannot say, from the record in this cause, that the court abused its discretion in ordering said viewing. (Sec. 11996, Rev. Codes 1921.)

8. The only criticism of the court's ruling upon the attempted impeachment of the defendant while he was a witness in his own behalf is that it was an attempt to impeach him on collateral matters, and such was the only objection of counsel to the questions asked. From the entire examination of the witness, both direct and cross, it is evident that the matter was not collateral, and does not fall within the rule laid down in the case of *State* v. *Smith*, 57 Mont. 349, 188 Pac. 644.

9. The defendant contends that the evidence is insufficient to warrant a conviction and in that connection asserts that witness Tom Gabel was an accomplice, and is not sufficiently corroborated by other evidence, which, in itself, tends to connect the defendant with the commission of the offense.

"An accomplice is one who is guilty of complicity in the crime charged, either by being present and aiding or abetting in it, or by having advised and encouraged it, though absent from the place at which it is committed." (*State* v. *Spotted Hawk*, 22 Mont. 33, 55 Pac. 1026.) "An accomplice is one who knowingly, voluntarily, and with common intent with the principal offender unites in the commission of a crime."

(*State ex rel. Webb* v. *District Court*, 37 Mont. 191, 15 Ann. Cas. 743, 95 Pac. 593.) ''To constitute a witness for the state an 'accomplice' he must have entertained a criminal intent common with that which moved the defendant to commit the crime with which he stood charged, or, not having been present at its commission, must have advised and encouraged it.'' (*State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270.) Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, no matter how reprehensible it may be, to constitute one an accomplice. (1 R. C. L. 157; *State* v. *Smith,* 75 Mont. 22, 241 Pac. 522.)

The only evidence from which the conclusion could be drawn that Gabel was an accomplice is the testimony of Gabel as hereinabove set forth, and it is manifest that he was not an accomplice in the larceny of the U Lazy D cattle; as a matter of fact, such testimony discloses that Arnold, Quinlan, and Smart were afraid of Gabel, and did not want him to know anything about the theft of such cattle, and the fact that Gabel was an accomplice in the larceny of the other cattle subsequent to the commission of the offense with which the defendant herein was charged, and of which he was convicted, does not constitute him an accomplice in the larceny of the U Lazy D cattle (*State* v. *Keithley,* 83 Mont. 177, 271 Pac. 449), and the testimony of Gabel alone is amply sufficient to sustain the conviction of the defendant.

10. The court did not err in overruling the defendant's objection to the form of the verdict submitted. Conceding that the case of *State* v. *Mason,* 62 Mont. 180, 204 Pac. 358, applies here, there was no evidence offered on the part of the defendant, nor introduced upon the part of the state, upon which the jury could base a verdict as to the value of the stolen cattle returned to the owner. (*State* v. *Dixson,* 80 Mont. 181, 260 Pac. 138.)

11. We have examined the instructions to which the defendant objected, the modification of instructions offered by the defendant, and the instructions offered by him which were

refused by the court, and find no prejudicial error committed in the rulings thereon.

··As no·reversible error is shown, the judgment and order are affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS, GALEN and FORD concur.

Rehearing denied April 4, 1929.