

DA 10-0269

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 79

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

COREY BROOKS JAY,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 09-0016
Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender; Jennifer A. Hurley, Assistant
Appellate Defender; Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General; Helena, Montana

          Scott Twito, Yellowstone County Attorney; David Carter, Deputy County
Attorney; Billings, Montana

Submitted on Briefs:  December 19, 2012

Decided:   March 26, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Corey Brooks Jay (Jay) appeals from the judgment of the Thirteenth Judicial District Court adjudging him guilty of two counts of negligent homicide and two counts of negligent endangerment.  He challenges the District Court's rulings, which denied his challenge of a prospective juror for cause, excluded his expert witness from testifying about complex partial seizures, denied his request for a lesser-included offense jury instruction, and ordered him to pay $600 in restitution to the State and an undetermined amount of restitution to the victims and their family members for mental health treatment.  We affirm in part and reverse in part, and address the following issues:

¶2     *Did the District Court err by denying Jay's challenge for cause?*

¶3     *Did the District Court err by excluding Jay's expert witness on complex partial seizures?*

¶4     *Did the District Court err by denying Jay's request to instruct the jury on DUI as a lesser-included offense of Vehicular Homicide While Under the Influence?*

¶5     *Did the District Court err by ordering Jay to pay restitution to the State and the victims and their family members?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶6     At around 8 p.m. on October 3, 2008, Jay was traveling westbound on Interstate 90 (I-90) between Laurel and Billings.  Commuters on I-90 watched as Jay's pickup suddenly made a sharp turn into the grass median that separated the eastbound and westbound traffic.  His pickup continued through the median before turning onto I-90 and driving into the oncoming eastbound traffic.  Jay traveled the wrong way on I-90 for approximately one-fifth of a mile.  Two cars successfully avoided colliding with Jay's

2

pickup by driving off the road. However, Jay's pickup struck a third car, carrying David Hanson (Hanson) and Janice Thomas (Thomas) at a high rate of speed. Hanson and Thomas suffered traumatic injuries that resulted in their deaths at the scene of the crash.

¶7    Emergency medical technicians (EMTs) assisting Hanson, Thomas, and Jay at the scene smelled the odor of alcoholic beverage on Jay's breath. When asked, Jay volunteered that he had drunk two beers and that this would teach him a lesson in "driving tired." Jay suffered a small laceration above his left eye and an open fracture on his left leg. EMTs transported Jay to St. Vincent's Hospital in Billings for treatment.

¶8    Troopers Kyle Hayter (Trooper Hayter) and Shane Warehime (Trooper Warehime) of the Montana Highway Patrol investigated the crash. Trooper Hayter arrived on scene at 8:22 p.m. He determined that Jay had traveled one-fifth of a mile the wrong way on I-90 before colliding with Hanson and Thomas. Nonhuman factors did not explain the crash: the weather was fine, there was no debris on the roadway, and the deliberate nature of the trajectory of Jay's truck was not consistent with mechanical problems. Data recovered from the power control module[1] of Jay's pickup revealed that Jay had not applied the brakes during the 25 seconds preceding the crash. Trooper Warehime photographed the crash scene, spoke with witnesses, and went to St. Vincent's Hospital to talk to Jay. Jay told Trooper Warehime he had drank two beers and had fallen asleep behind the wheel.

---

[1] According to trial testimony, a power control module is "a relatively simple computer that's used to control engine function." In the case of Jay's pickup, the module recorded the data that could then be downloaded and analyzed.

¶9      Dr. Rentz, a surgeon, treated Jay at St. Vincent's Hospital. Jay was coherent. He understood that he was in the emergency room, and why he was there. While Jay appeared alert, Dr. Rentz smelled alcohol on Jay and noted that he was behaving like he had been drinking. A neurosurgeon performed a head CT scan, which came back non-remarkable; the neurosurgeon did not recommend any follow up treatment for a brain injury or disorder. Jay told Dr. Rentz that he did not have a history of seizures. At 9:20 p.m., St. Vincent's Hospital staff drew a plasma blood sample from Jay as part of his medical treatment. Subsequent testing registered Jay's blood alcohol content (BAC) between 0.0706 and 0.088.[2]

¶10     The State charged Jay with two counts of Vehicular Homicide While Under the Influence for the deaths of Hanson and Thomas. In the alternative, the State charged Jay with two counts of Negligent Homicide for Hanson's and Thomas's deaths. The State also charged Jay with two counts of Criminal Endangerment for forcing other drivers off the road to avoid colliding with Jay.

¶11     Jay pleaded not guilty to the charges and sought to prove at trial that his driving was the result of losing consciousness before the crash, perhaps because of a seizure. Prior to trial, Jay disclosed he intended to call Dr. Dale Peterson, a specialist in neurology, to testify as an expert on seizure disorders and their symptoms, effects, and

---

[2] Because the Montana State Crime Laboratory measures BAC based on a whole blood sample, toxicology experts converted Jay's plasma sample BAC to a whole blood sample BAC. Different experts used slightly different conversion rates to convert plasma BAC to whole blood BAC. According to the State's expert, Jay had a BAC of between 0.0765 and 0.0818. According to Jay's expert, Jay's BAC was between 0.0706 and 0.088.

4

diagnosis. The State moved to exclude Dr. Peterson after its interview with him revealed that he had never examined Jay; his only basis of knowledge about Jay's medical status and about what happened on October 3, 2008, consisted of a 30-minute electroencephalogram (EEG)[3] that was "unremarkable," in that it did not show Jay was suffering from seizures, and an oral account of events provided by Jay's lawyer.

¶12 On November 24, 2009, the District Court conducted a hearing on pretrial motions, including the State's motion to exclude Dr. Peterson. Jay's counsel advised the court that Dr. Peterson would not be offering an opinion as to whether Jay suffered a seizure while driving; rather, Dr. Peterson would merely explain the typical symptoms of complex partial seizures and the difficulty in diagnosing them. The District Court excluded Dr. Peterson from testifying pursuant to M. R. Evid. 402, 403, and 702.

¶13 During *voir dire*, Jay's counsel questioned prospective jurors about their feelings on the presumption of innocence. Following this questioning, Jay challenged for cause potential juror Bennett because she voiced concerns about her ability to be impartial given the issue of drinking and driving. The District Court denied the challenge and Jay removed Bennett by exercising a peremptory challenge. During the settling of jury instructions, Jay requested the court to instruct the jury on the lesser-included offense of Driving Under the Influence (DUI) to the charges of Vehicular Homicide while Under the Influence. The court denied the request, reasoning that while DUI was a

---

[3] During an EEG, the patient's brainwaves are measured by means of electrodes applied to the scalp. The physician can identify a neurological disorder by matching the patient's brainwaves to signature brainwaves associated with a particular disorder. *Dorland's Illustrated Medical Dictionary* 600 (32d ed., Elsevier Saunders 2012).

lesser-included offense, the facts of Jay's case did not support the instruction. The court did instruct the jury on the lesser-included offense of Negligent Endangerment to the charges of Criminal Endangerment.

¶14 The jury convicted Jay of two counts of Negligent Homicide and two counts of Negligent Endangerment. The District Court imposed a thirty year sentence in the Montana State Prison with ten years suspended. The court further ordered, over Jay's objection, that he pay the State $600 in restitution for expenses incurred in interviewing Dr. Peterson and that he was "financially responsible for the cost of mental health treatment for the victims and their family members." Jay appeals.

**STANDARD OF REVIEW**

¶15 This Court reviews a district court's denial of a challenge for cause to a prospective juror for abuse of discretion. *State v. Allen*, 2010 MT 214, ¶ 20, 357 Mont. 495, 241 P.3d 1045. We review the district court's determination regarding the qualification and competency of an expert witness for an abuse of discretion. *State v. Bollman*, 2012 MT 49, ¶ 22, 364 Mont. 265, 272 P.3d 650. The trial court has "*great latitude*" in ruling on the admissibility of expert testimony. *State v. Crawford*, 2003 MT 118, ¶ 30, 315 Mont. 480, 68 P.3d 848 (emphasis in original). A district court's refusal to give an instruction on a lesser-included offense is also reviewed for abuse of discretion. *State v. Feltz*, 2010 MT 48, ¶ 14, 355 Mont. 308, 227 P.3d 1035. Finally, we review restrictions or conditions on a sentence for both legality and abuse of discretion. *State v. Hafner*, 2010 MT 233, ¶ 13, 358 Mont. 137, 243 P.3d 435.

DISCUSSION

¶16   *Did the District Court err in denying Jay's challenge for cause?*

¶17   Jay argues that the District Court should have removed Bennett from the jury pool because her statements during *voir dire* that she had strong feelings against drinking and driving showed that she could not be impartial and presume Jay was innocent.  The State counters that Bennett demonstrated that she was willing to put her personal feelings about drinking and driving aside, be impartial, and apply the law as instructed by the court.

¶18   Jay's counsel began his *voir dire* with a discussion of the presumption of innocence.  Several potential jurors explained their understanding of "innocent until proven guilty."  One potential juror said that she needed to see the facts of the case before deciding innocence or guilt but felt that Jay should not have been driving if he had been drinking.  Shortly after, Jay's counsel had the following colloquy with a different potential juror, Bennett:

> DEFENSE COUNSEL: Miss Bennett, how about you?  Is that—do you think it's a natural thing, first of all, to think that because my client is sitting up here that he probably did something wrong?
>
> BENNETT: I don't think it feels natural in this instance, because of, you know, the questions that are being asked at this time and, you know, sort of the situation.  You know, I kind of feel like, you know, in any case, I'm right in the middle until I see evidence one way or the other, just like everyone else has talked about.  But, we're here for a reason.  And if we're here for a reason, then I can't assume complete innocence.
>
> DEFENSE COUNSEL: Okay.  If you—the Judge is going to read some jury instructions, and that will be one of the jury instructions is that you are required actually to presume him innocent and maintain that presumption of innocence until you have heard all of the evidence.  Is that a jury instruction—is that an instruction that you can follow?

BENNETT: I think it would be very difficult to follow, just having heard what we've heard today.

DEFENSE COUNSEL: So you're saying that basically—

BENNETT: You know, if chosen for the jury trial and that's an instruction from the Judge, I'm going to follow that instruction. Personally, I would find it difficult.

DEFENSE COUNSEL: Do you think you'll be able to ultimately overcome those personal feelings?

BENNETT: I would hope that, you know, based on the evidence that's provided to us, that I would make a decision based purely on what I see and what facts I have laid out in front of me.

DEFENSE COUNSEL: Okay. Do you have some fear that maybe you won't be able to do that?

BENNETT: You know, I feel very passionately about driving under the influence, so there's a possibility, yes.

DEFENSE COUNSEL: Okay. Let me ask you this, if you were my client, would you want someone with your mindset in the jury?

BENNETT: Probably not.

DEFENSE COUNSEL: Okay. And is that because, ultimately, you think you might have insurmountable difficulties putting aside those sorts of passions that you have?

BENNETT: Yes.

DEFENSE COUNSEL: Your honor, I would request that she be excused for cause.

The State questioned Bennett about her views.

PROSECUTOR: Your honor, just a moment. Miss Bennett, everyone comes in this courtroom with beliefs, feelings, attitudes. The question is, can you follow the law?

8

BENNETT: Yes.

PROSECUTOR: Okay. So you had mentioned on Defense counsel's questions, asked, just unprompted, that if that's what the Judge instructed you to do, you could follow the law?

BENNETT: Yes.

PROSECUTOR: If the State showed you what happened and why it happened, and obviously we don't have any facts, I mean that's just the way a jury trial works, but the State proved its case beyond a reasonable doubt that the Defendant committed vehicular homicide or negligent homicide, manslaughter, to either David Hanson or Janice Thomas, could you find the Defendant guilty?

BENNETT: Yes.

PROSECUTOR: If the State did not prove the case beyond a reasonable doubt, based on what the Judge tells you, and what you believe at that time, after watching every witness and seeing every exhibit after every day of the trial, could you find the Defendant not guilty?

BENNETT: Yes.

PROSECUTOR: And simply because you have a strong feeling on DUI, is that going to affect that? Will you say he's guilty because I don't like drunk drivers, or will you say he's not guilty because the State did not prove its case?

BENNETT: I would say I would make my decision based on the evidence. If it was proved beyond a reasonable doubt, I would—you know, I would have no problem finding the Defendant guilty.

PROSECUTOR: And I'm the prosecutor, so—he's the Defense attorney, but he's entitled to that. Because in theory, right, wrong or otherwise, we would hope, in theory, anyone could be sitting in that chair. So you don't have a problem rendering verdict solely on the evidence and the instructions by the Court?

BENNETT: No.

PROSECUTOR: You Honor, I would actually object. I think everyone comes in this courtroom with some belief or understanding. And if that's the standard, then no one could ever sit on a jury.

THE COURT: That motion is denied.

¶19 Section 46-16-115(j), MCA, provides that a potential juror may be removed for cause if she has "a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." To determine whether a juror should be excused, courts must look to the "totality of the circumstances" of the witness's *voir dire* examination. *State v. Robinson*, 2008 MT 34, ¶ 8, 341 Mont. 300, 177 P.3d 488 (overruled on other grounds in *State v. Gunderson*, 2010 MT 166, ¶ 54, 357 Mont. 142, 237 P.3d 74). If questioning raises "serious doubts" as to the "juror's ability to be fair and impartial," the court should err on the side of caution and remove the juror. *Robinson*, ¶ 8. A prospective juror's "spontaneous statements" are given more weight than "coaxed recantations" elicited by counsel because spontaneous statements are "most likely to be reliable and honest." *Robinson*, ¶ 11; *State v. DeVore*, 1998 MT 340, ¶ 28, 292 Mont. 325, 972 P.2d 816 (overruled on other grounds in *State v. Good*, 2002 MT 59, ¶ 63, 309 Mont. 113, 43 P.3d 948).

¶20 If a prospective juror makes statements to the effect that she *cannot* suspend her fixed beliefs and follow the law, that juror should be excused for cause. *Robinson*, ¶ 13. On the other hand, a juror should not be removed merely because she voices a concern about being impartial—every person comes to jury duty with preconceptions. *Robinson*,

10

¶ 13 (it is "reasonable and logical" for a prospective juror to presume that there is "some reason" that the State charged the defendant with a crime). When a juror makes comments suggesting a fixed opinion as to the defendant's guilt but then says she can set that opinion to the side and follow the law, it is "within the discretion of the district court" to decide whether the juror will be able to be impartial:

> When a juror makes conflicting statements . . . the decision whether to grant a challenge for cause is within the discretion of the trial court, who has the ability to look into the eyes of the juror in question, and to consider her responses in the context of the courtroom, and then determine whether serious doubts exist about the juror's ability to be impartial.

*Robinson*, ¶ 13.

¶21     Our prior cases illustrate the difference between a potential juror who has a "fixed opinion" and a potential juror who has mere preconceptions. In *State v. Falls Down*, 2003 MT 300, ¶¶ 25-26, 28, 31, 33, 318 Mont. 219, 79 P.3d 797, four potential jurors indicated that they had formed opinions as to Falls Down's guilt of deliberate homicide based on media coverage. Upon further questioning, they all agreed that they would be able to set their preconceptions aside, follow the law, and presume Falls Down was innocent until proven guilty. We affirmed the district court's refusal to remove the potential jurors for cause because they were not "fixed" or "set" in their opinions of the defendant's guilt. *Falls Down*, ¶¶ 27, 30, 32, 35.

¶22     In contrast, in *DeVore*, ¶ 16, two potential jurors indicated that DeVore was "guilty of something" or he would not have been charged with a crime. DeVore challenged these jurors for cause, on the grounds that their statements showed they could

11

not be impartial and presume DeVore innocent until proven guilty. *DeVore*, ¶¶ 17-18. Before ruling, the district court instructed DeVore's counsel to discuss the presumption of innocence with the jurors. *DeVore*, ¶ 17. The two prospective jurors responded to this discussion by stating that, although they would not find DeVore guilty until they heard all of the evidence, they still thought he was "involved" or "guilty of something" or he would not have been charged. *DeVore*, ¶¶ 18-19. The district court rejected DeVore's challenge for cause, and we reversed. *DeVore*, ¶¶ 1, 20. We held that because the potential jurors had continued to adhere to their beliefs about DeVore's guilt, the district court should have excused them for having a fixed opinion: "[D]isqualification based on a juror's alleged prejudice is necessary only where jurors 'form fixed opinions on the guilt or innocence of the defendant which they would not be able to lay aside and render a verdict based solely on the evidence presented in court.'" *DeVore*, ¶ 21 (quoting *Great Falls Tribune v. Dist. Ct.*, 186 Mont. 433, 439-40, 608 P.2d 116, 120 (1980)). We reached the same conclusion under similar facts in *State v. Braunreiter*, 2008 MT 197, ¶ 13, 344 Mont. 59, 185 P.3d 1024 (holding that prospective juror's lukewarm agreement to follow the law was insufficient to dissipate concerns raised by his initial responses).

¶23 Here, Bennett's comments are closer to the juror statements in *Falls Down* than the juror comments in *DeVore* or *Braunreiter*. While Bennett was clear that she had preconceptions about people that drink and drive, she did not make comments demonstrating a "fixed opinion" as to Jay's guilt. Indeed, without prompting, Bennett told Jay's counsel that although she would find it personally difficult to presume Jay

12

innocent, she could and would do so: "You know, if chosen for the jury trial and that's an instruction from the Judge, I'm going to follow that instruction. Personally, I would find it difficult." It was following this initial, spontaneous response that Jay's counsel asked Bennett a series of leading questions that revealed the difficulty Bennett would have in setting aside her feelings, and the prosecutor asked a series of leading questions revealing that Bennett would set her personal feelings aside, apply the law, and presume Jay innocent until proven guilty.

¶24 Bennett's somewhat contradictory responses to counsels' leading questions are why we give more weight to "spontaneous" statements than "coaxed recantations." *Robinson*, ¶ 8. Bennett expressed agreement both with Jay's counsel that it would be difficult for her to be impartial and with the prosecutor that she would be impartial and follow the law. The response "most likely to be reliable and trustworthy," *Robinson*, ¶ 8, was Bennett's earlier spontaneous statement that she would follow the law even though she would find it personally difficult. This statement demonstrated a preconception and not a "fixed opinion." We conclude that the record fails to demonstrate that Bennett had "a state of mind in reference to the case or to either of the parties that would prevent the juror from acting with entire impartiality and without prejudice to the substantial rights of either party." Section 46-16-115(j), MCA. The District Court did not abuse its discretion in denying the challenge for cause.

13

¶25    *Did the District Court err in excluding Jay's expert witness on complex partial seizures?*

¶26    The District Court excluded Dr. Peterson from testifying about complex partial seizures on the ground that Jay failed to demonstrate a "nexus" between such a seizure and his driving. Jay argues this was error because the unexplained nature of his driving was enough to raise the possibility that he had suffered a seizure.

¶27    The admission of expert testimony is governed by M. R. Evid. 701-705. M. R. Evid. 702 provides that expert testimony in the form of "an opinion or otherwise" is admissible if it will assist the jury in deciding the case:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion *or otherwise*.

(Emphasis added.) The Commission Comments to Rule 702 explain that the "or otherwise" language allows "an expert to give testimony which need not be in the form of opinion, but which informs the jury so they may render the correct decision." Section 26-10-Rule 702, Commission Comments at 393 (2012).[4] Commentators have opined that

---

[4] This is consistent with the official comments of Fed. R. Evid. 702, which provides, in pertinent part:

> Most of the literature assumes that experts testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly recognizes that an expert on the stand may give a dissertation *or exposition* of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts. Since much of the criticism of expert testimony has centered upon the hypothetical question, it seems wise to recognize that opinions are not indispensable and to encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference.

Rule 702 permits an expert to "give test results, describe recognized principles of their specialized knowledge, provide general background, or simply to explain other evidence." Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure*, vol. 29, § 6263, 197 (West 1997).

¶28 *State v. Cassill*, 70 Mont. 433, 227 P. 49 (1924) illustrates the use of such testimony. In *Cassill*, bank employees were charged with falsifying a bank's ledgers and financial disclosures. *Cassill*, 70 Mont. at 435-36, 227 P. at 50-51. During trial, the State called witnesses experienced in accounting and bookkeeping to explain the meaning of various entries in the bank's ledgers to the jury. *Cassill*, 70 Mont. at 448, 227 P. at 55. These experts did not testify as to whether the defendants had falsified entries; rather, they explained how a ledger worked and what different entries meant. *Cassill*, 70 Mont. at 448-49, 227 P. at 55. We "found the explanations illuminative and useful and have no doubt served to enlighten the jury" and affirmed the District Court's admission of the testimony. *Cassill*, 70 Mont. at 449, 227 P. at 55.

¶29 Of course, not all exposition testimony will necessarily "assist" or "enlighten the jury." Like all evidence, expert testimony must be relevant, or have the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Thus, it has been noted that "in order for expert testimony to be relevant there must be a

---

(Emphasis added.) Drawing upon the comment's language, some commentators refer to this testimony as "exposition" testimony. *See* Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 Marq. L. Rev. 173, 219-20 (2006).

connection between the expert's [testimony] and fact testimony." 32 C.J.S. *Evidence* § 804, at 465 (West 2008); *accord U.S. v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985) ("An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."); *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002) (noting that expert testimony is only relevant when it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.") (internal quotation marks omitted).

¶30    In seeking to introduce Dr. Peterson's exposition testimony about complex partial seizures, Jay's counsel explained that Dr. Peterson's testimony would educate the jury without giving an opinion as to whether Jay, in fact, had suffered a seizure:

> [W]hen you look at Rule 702, experts do not have to give statements in terms of opinions only. They can be opinions or testimony, or other testimony. In this case, I think the other testimony that Dr. Peterson could give would be educating the jury about complex partial seizures and how that, how you can't rule that out in this case when, you know, the level of proof for defense is to show that there is a reasonable doubt.

Thus, Jay's position was that the basis for educating the jury about complex partial seizures was that Dr. Peterson could not rule out the possibility that Jay had suffered a seizure while driving.

¶31    However, Dr. Peterson had never spoken to Jay or any of his previous treating physicians; he had not been provided with Jay's medical history, other than an "unremarkable" EEG; nor had he been provided with the medical history of Jay's family. Dr. Peterson's testimony was potentially complicated and, as Jay acknowledges,

16

"seizures are difficult to diagnose, even for experts." No evidentiary connection was established between seizures and Jay's driving. Dr. Peterson's testimony would not serve to assist the jury as in *Cassill*, where expert testimony about bookkeeping methods gave the jury the tools necessary to determine if the bank's ledgers accurately reflected its assets. While we agree that Jay did not need to provide a "definitive medical diagnosis of a seizure," he was required to establish *some* factual connection between the offered expert testimony and his driving in this case to make the testimony relevant. M. R. Evid. 402. Expert testimony about a causal theory that was not connected to the facts of the case could well serve to confuse the jury. We conclude the District Court did not abuse its discretion in excluding Dr. Peterson's expository testimony.

¶32 Jay argues alternatively that even if the District Court properly applied Rule 702, the exclusion of Dr. Peterson's testimony nonetheless violated his right to present a defense. The Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clause of the Sixth Amendment "guarantee[] criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. S.C.*, 547 U.S. 319, 324, 126 S. Ct. 1722, 1731 (2006) (quoting *Crane v. Ky.*, 476 U.S. 683, 690, 106 S. Ct. 2142, 2142 (1986)). This right to present a defense can be "abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324, 126 S. Ct. at 1731 (internal brackets and quotation marks omitted).

17

¶33 The Ninth Circuit Court of Appeals has rejected a similar due process challenge. *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2008). In *Moses*, the defendant was charged with shooting and killing his wife. The defendant alleged that she shot herself. The defendant sought to call at trial a doctor who would testify that the victim was depressed and that depression increased the likelihood of suicide. *Moses*, 555 F.3d at 749. The trial court excluded the evidence under Rule 702. *Moses*, 555 F.3d at 750. In a subsequent habeas proceeding, the Ninth Circuit held that this application of Rule 702 did not impermissibly infringe on the defendant's right to present a defense. *Moses*, 555 F.3d at 760. The Ninth Circuit recognized that unlike the state evidentiary rules that have been struck down by the Supreme Court,[5] Rule 702 was a "'well-established rule of evidence' that permits a court to exercise its discretion in admitting expert testimony when relevant":

> Indeed, Rule 702 is different in kind from the rules [struck down by the Supreme Court]. The evidentiary rules in those cases, by their terms, required the trial court to exclude crucial evidence that had a critical effect on the trial, with little or no rational justification. In general, the rules precluded a defendant from testifying, excluded testimony from key percipient witnesses, or excluded the introduction of all evidence relating to a crucial defense. In contrast, Rule 702 does not require a trial court to exclude evidence. Rather, it authorizes a court to admit expert testimony if it will assist the trier of fact to understand the evidence or a fact in issue.

---

[5] These evidentiary rules *required* trial courts to exclude evidence based on dubious, irrational reasoning. *See Holmes*, 547 U.S. at 328-31, 126 S. Ct. 1727 (evidentiary rule prevented defendant from presenting evidence that a third party had committed crime if the judge determined the prosecutor's case was strong); *Rock v. Ark.*, 483 U.S. 44, 107 S. Ct. 2704 (1987) (evidentiary rule prohibited witness from testifying about memories recalled after hypnosis); *Washington v. Tex.*, 388 U.S. 14, 87 S. Ct. 1920 (1967) (evidentiary rule prohibited alleged accomplice from testifying on the defendant's behalf but he could testify for the government).

*Moses*, 555 F.3d at 758 (internal quotation marks omitted) (quoting *Holmes*, 547 U.S. at 326, 126 S. Ct. 1227).  Because Rule 702 is rationally related to the important goal of admitting only expert testimony that has a logical connection to the central issues of the case, the Ninth Circuit upheld it as constitutional.  *Moses*, 555 F.3d at 758.

¶34    We concur with the Ninth Circuit's reasoning in *Moses*.  Here, the District Court determined that Dr. Peterson's testimony would not assist the jury because it had a weak, arguably nonexistent, connection to Jay's driving on October 3, 2008.  Therefore, the District Court's application of Rule 702 did not abridge Jay's constitutional right to present his defense.

¶35    Finally, Jay argues that if the District Court properly excluded Dr. Peterson's testimony because it bore no connection to Jay's driving, then his lawyer provided ineffective assistance by failing to establish a connection.  Jay argues his lawyer could have made that connection by: (1) submitting Jay's family's history of seizures to the court, and/or (2) having Dr. Peterson run medical tests on Jay to determine if he had a seizure.  Jay's lawyer did neither.  The State argues that Jay's ineffective assistance claim is non-record based and, therefore, must be addressed in postconviction proceedings.

¶36    "This Court may review a claim of ineffective assistance of counsel on direct appeal only when the record 'fully explains why counsel took, or failed to take, action in providing a defense for the accused.'"  *Longjaw v. State*, 2012 MT 243, ¶ 19, 366 Mont. 427, 288 P.3d 210 (quoting *State v. Deschon*, 2004 MT 32 ¶ 31, 320 Mont. 1, 85 P.3d 756).  In *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340, we explained

19

that "the definitive question that distinguishes and decides which actions are record and which are non-record is *why*? . . . [D]oes the record fully explain *why* counsel took the particular course of action?" (Emphasis in original.) "When ineffective assistance of counsel claims are non-record based, the proper avenue for review is through a petition for postconviction relief." *Longjaw*, ¶ 20.

¶37 Here, the record does not "fully explain" why Jay's counsel did not make further effort to establish a connection between seizures and Jay's driving. While Jay claims that his counsel was deficient by failing to submit to the District Court evidence that members of his family had suffered seizures, thereby showing that he is genetically predisposed to seizures, there is no evidence in the record of his family's medical history. Jay also claims his counsel was deficient for failing to have Dr. Peterson test Jay to determine if he had suffered a seizure. However, Jay's counsel may have had a tactically sound strategy for not doing so—he may have believed that a full medical examination would hurt Jay's case. Jay's counsel may have sought to gain the benefits of Dr. Peterson's testimony (providing the jury with an alternative explanation of Jay's driving) without incurring any risks (Dr. Peterson concluding after examining Jay that he had not suffered a seizure). This strategy is not foreclosed by the record and thus does not fully explain why Jay's counsel "took the particular course of action" he did. *Longjaw*, ¶ 20. Jay's claim is appropriately reserved for postconviction proceedings.

¶38 *Did the District Court err when it refused to instruct the jury on DUI as a lesser-included offense of Vehicular Homicide While Under the Influence?*

20

¶39 The District Court rejected Jay's request to instruct the jury on DUI as a lesser-included offense of Vehicular Homicide while Under the Influence because it concluded that the evidence did not support the instruction. To determine if a lesser-included offense instruction should have been given at trial, we follow the two-step approach articulated in *State v. Castle*, 285 Mont. 363, 368, 948 P.2d 688, 690-91 (1997). First, we determine if, as a matter of law, the offense for which the instruction is requested is a lesser-included offense of the offense charged. Then, we determine if the lesser-included instruction is supported by the evidence of the case.

¶40 A lesser included offense is defined as an offense that "is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" Section 46-1-202(9)(a). "'[F]acts' 'in subsection (a) of § 46-1-202(9), MCA refers to the statutory elements of the charged offense and not to the individual facts of the case.'" *State v. Molenda*, 2010 MT 215, ¶ 7, 358 Mont. 1, 243 P.3d 387 (quoting *State v. Beavers*, 1999 MT 260, ¶ 30, 296 Mont. 340, 987 P.2d 371).

¶41 Vehicular Homicide While Under the Influence occurs when a "person negligently causes the death of another human being while the person is operating a vehicle in violation of 61-8-401 or 61-8-406." Section 45-5-106, MCA. The statute incorporates the elements of a DUI offense as necessary elements of the Vehicular Homicide offense. Therefore, a DUI offense is "established by proof of the same or less than all the [elements] required to establish the commission of [Vehicular Homicide While Under the Influence]," and is a lesser-included offense. Section 46-1-202(9)(a), MCA.

21

¶42 Under the second step of *Castle,* a lesser-included offense instruction must be given when "the jury, based on the evidence, could be warranted in finding the defendant guilty of a lesser included offense." Section 46-16-607(2); *Castle*, 285 Mont. at 369, 948 P.2d at 691. "A lesser-included offense instruction is not supported by the evidence when the defendant's evidence or theory, if believed, would require an acquittal." *State v. Burkhart*, 2004 MT 372, ¶ 39, 325 Mont. 27, 103 P.3d 1037; *State v. German*, 2001 MT 156, ¶ 11, 306 Mont. 92, 30 P.3d 360; *State v. Martinez*, 1998 MT 265, ¶ 10, 291 Mont. 306, 968 P.2d 705; *State v. Schmalz*, 1998 MT 210, ¶ 23, 290 Mont. 420, 964 P.2d 763; *State v. Howell*, 1998 MT 20, ¶ 34, 287 Mont. 268, 954 P.2d 1002; *State v. Grindheim*, 2004 MT 311, ¶ 41, 323 Mont. 519, 101 P.3d 267.

¶43 Grindheim was charged with sexual intercourse without consent arising from allegations that he forced a 12-year-old girl to put her mouth on his penis while the two were sharing a couch for the night. *Grindheim*, ¶¶ 11, 14. The girl accused Grindheim of grabbing her and forcing her head down on his penis even though she had told him "no" and that "she did not want to." *Grindheim*, ¶ 11. Grindheim's defense at trial was that the girl had awoken him in the middle of the night by touching him in a sexual manner, and that he had responded by immediately leaving the couch and sleeping outside. *Grindheim*, ¶ 41. Grindheim asked the court to instruct the jury on the lesser-included crime of "endangering the welfare of a child." *Grindheim*, ¶¶ 38-39. The trial court refused the instruction, and we affirmed, reasoning that Grindheim's theory of the facts supported his outright acquittal, not a conviction for endangerment of children:

22

Even were we to accept Grindheim's assertion that the offense of endangerment of children was a lesser-included offense, the evidence in this trial would not have supported Grindheim's conviction of that offense, but rather, would instead have supported Grindheim's acquittal. Grindheim's evidence and theory was that some "unknown person" unzipped his sleeping bag and began "messing around" with him in a sexual manner. After he realized what was going on, he asserted that he jumped off the couch, took his sleeping bag, and went out to sleep in the yard. Thus, Grindheim's evidence and theory does not offer proof of "assisting, promoting or encouraging" a child to engage in sexual conduct pursuant to § 45–5–622(2)(b)(ii), MCA. Therefore, we conclude the District Court did not abuse its discretion in denying Grindheim's requested lesser-included offense instruction.

*Grindheim*, ¶ 41.

¶44 Here, Jay's theory of the facts supported his outright acquittal, not a conviction for DUI. Jay's defense was that he was unconscious when his pickup drove through the grass median, into oncoming traffic, and the wrong way on I-90 for one-fifth of a mile. Jay testified that he drank a few beers prior to the crash, but that he did not feel impaired and, consistent with this testimony, Jay's counsel extensively argued during closing arguments that Jay was unconscious and not under the influence of alcohol. Thus, Jay's theory was that he had "lost consciousness" for a reason other than alcohol consumption. Because Jay's "theory, if believed, would require an acquittal," a lesser-included instruction for DUI was "not supported by the evidence[.]" *Burkhart*, ¶ 39; *German*, ¶ 11; *Martinez*, ¶ 10, *Schmalz*, ¶ 23; *Howell*, ¶ 34; *Grindheim*, ¶ 41. The District Court did not abuse its discretion by refusing to give the lesser-included instruction to the jury.

23

¶45     *Did the District Court err when it ordered Jay to pay restitution to the State and the victims and their family members?*

¶46     The District Court ordered Jay to pay restitution to the State in the amount of $600 for the costs related to its pretrial interview of Dr. Peterson.  The court also ordered that Jay was "financially responsible" for the cost of "mental health treatment for the victims and their family members[,]" but did not impose a specific amount of this obligation.  Jay argues that the $600 award to the State was improper because the State was not the victim of the crime, and the obligation to pay for the victims' mental health treatment was improper because the total amount of restitution was not specified.

¶47     The State concedes that the District Court's open-ended restitution award for mental health treatment was error.  Section 46-18-244(1) requires the sentencing court to "specify the total amount of restitution that the offender shall pay."

¶48     We conclude that the District Court's restitution award of $600 to the State for costs incurred in interviewing Dr. Peterson was also error.   Section 46-18-201(5) provides:

> [I]f a person has been found guilty of an offense upon a verdict of guilty . . . and the sentencing judge finds that a victim, as defined in 46-18-243, has sustained a pecuniary loss, the sentencing judge shall, as part of the sentence, require payment of full restitution to the victim[.]

Section 46-18-243(2)(a) defines "victim" to include a governmental entity only when that entity suffers property damage in the commission of a crime, or incurs costs in the investigation or apprehension of an escaped person.   Here, the State did not suffer property damage or incur costs apprehending Jay, but rather incurred expenses by

interviewing a potential defense witness. The State was not a "victim" entitled to restitution. *State v. Setter*, 2001 MT 101, ¶ 21, 305 Mont. 253, 25 P.3d 893 ("restitution is statutorily limited to the 'victim' of the crime for which a defendant is convicted") (overruled on other grounds in *State v. Herman*, 2008 MT 187, ¶ 12 n. 1, 343 Mont. 494, 188 P.3d 978); *State v. Horton*, 2001 MT 100, ¶ 25, 305 Mont. 242, 25 P.3d 886 (same).

¶49 Accordingly, we vacate the $600 restitution award to the State. We reverse the open-ended restitution award for the victims' mental health treatment and remand this matter to the District Court for entry of an amended judgment specifying the amount for such treatment, in accordance with the statute.

¶50 Affirmed in part, reversed in part, and remanded for entry of an amended judgment consistent herewith.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT