**FILED**

July 16 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0159

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 190

STATE OF MONTANA,

Plaintiff and Appellee,

v.

CLARENCE EDWARD CHAMPAGNE,

Defendant and Appellant.

APPEAL FROM:     District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 10-50
Honorable Laurie McKinnon, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant Appellate Defender; Helena, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss, Assistant Attorney General; Helena, Montana

Gina Dahl, Hill County Attorney; Havre, Montana

Submitted on Briefs:  May 15, 2013
Decided:  July 16, 2013

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     Clarence Edward Champagne (Champagne) appeals his conviction from the Twelfth Judicial District, Hill County.   We affirm in part, reverse in part, and remand.

¶2     We address the following issues on appeal:

¶3     *Whether the District Court abused its discretion in denying Champagne's for-cause challenge of a prospective juror?*

¶4     *Whether Champagne's counsel provided ineffective assistance?*

¶5     *Whether the District Court abused its discretion in admitting the forensic interviewer's opinion testimony?*

¶6     *Whether the District Court properly admitted J.B.'s prior consistent statements?*

¶7     *Whether the District Court imposed an illegal sentence?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶8     J.B. stayed at her grandmother's house one night in 2010.  Nobody remembers the exact date.  J.B. was ten years old at the time.  J.B.'s grandmother, Ramona, previously had been married to Champagne.  Champagne came to Ramona's house late that night.  J.B. had known Champagne for most of her life.  J.B. referred to him as "Papa."

¶9     J.B. was awakened the next morning by Champagne touching her inside her vagina. J.B. immediately told Ramona what had happened.  Ramona asked Champagne about the incident.  Champagne denied any inappropriate touching.  Ramona told J.B. that Champagne probably just had given J.B. a hug.  Ramona instructed J.B. not to tell her mother about the incident.

2

¶10    J.B. told her mother, Farrah Falcon (Falcon), about the incident several months later. Falcon alerted the police. The police initiated an investigation. J.B. talked with a forensic interviewer, Holly Matkin, about the incident. The State charged Champagne with felony sexual assault. The case proceeded to trial.

¶11    Prospective juror Pete Lamere (Lamere) replied during voir dire when asked by Champagne's counsel that he had "some reservations" about a defendant who did not testify. Lamere further admitted that he "probably" would become suspicious if a defendant chose not to testify. Champagne challenged Lamere for cause.

¶12    The District Court instructed Lamere on the presumption of innocence, the State's burden of proof, a defendant's right not to testify, and the idea that a jury should not draw any negative inference from the defendant's election not to testify. The State questioned Lamere. Lamere agreed with the State that many reasons existed why a person would not want to testify that were unrelated to trying to hide something. Lamere agreed that he would follow the law and that he would not draw any negative inferences. The District Court denied Champagne's motion to remove Lamere for cause. Champagne used a peremptory challenge to remove Lamere. Champagne exhausted all of his peremptory challenges.

¶13    Another prospective juror, Andrew Herdina (Herdina), filed an Affidavit for Excusal with the clerk of court that requested permanent exclusion from jury service. Herdina stated, "I am a federal law enforcement officer and feel I may be biased in a criminal trial." The clerk of court advised Herdina to discuss his potential bias with the lawyers in the case to which he would be assigned. The record does not reflect whether Champagne's defense

3

counsel had knowledge of Herdina's affidavit. Herdina did not raise the issue of his potential bias during voir dire. Champagne's defense counsel did not question Herdina about his law enforcement background or his claimed bias. Herdina served on Champagne's jury.

¶14 Champagne alleged at trial that J.B. had made up the story. Champagne claimed that J.B.'s accusations against Champagne arose from a family feud. Champagne alternatively claimed that J.B. sought to protect her actual abuser by blaming Champagne.

¶15 Matkin testified for the State. The State failed to qualify Matkin as an expert. The District Court nevertheless permitted Matkin to testify that her training as a forensic interviewer included whether a witness had been coached. The District Court further permitted Matkin to testify that she had seen no indications that J.B. had been coached. Matkin and J.B.'s mother, Falcon, also repeated J.B.'s earlier statements to them regarding what Champagne had done to her. The jury convicted Champagne of felony sexual assault.

¶16 The District Court imposed a sentence of 40 years at the Montana State Prison. The District Court imposed a restitution obligation in an initial amount of $1,583, with an ongoing obligation to the extent that J.B. requires additional or ongoing treatment. The District Court's judgment enumerated several recommendations for the Department of Corrections. These recommendations included that Champagne be required to pay $3,478.09 for legal fees and expenses, plus the costs of jury service, prosecution and pretrial, probation, or community service supervision.

**STANDARD OF REVIEW**

4

¶17 We review for abuse of discretion a district court's denial of a challenge for cause of a prospective juror. *State v. Jay*, 2013 MT 79, ¶ 15, 369 Mont. 332, 298 P.3d 396. We review de novo a claim of ineffective assistance of counsel. *State v. Upshaw*, 2006 MT 341, ¶ 13, 335 Mont. 162, 153 P.3d 579. We review for abuse of discretion rulings on the admissibility of evidence, including oral testimony. *State v. Henderson*, 2005 MT 333, ¶ 8, 330 Mont. 34, 125 P.3d 1132. We review for legality a sentence involving incarceration of a year or more. *State v. Heafner*, 2010 MT 87, ¶ 1, 356 Mont. 128, 231 P.3d 1087.

## DISCUSSION

¶18 *Whether the District Court abused its discretion in denying Champagne's for-cause challenge of a prospective juror?*

¶19 A potential juror may be removed for cause if he possesses a state of mind that would prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party. Section 46-16-115(2)(j), MCA; *Jay*, ¶ 19. A court must look at the totality of the circumstances of the potential juror's voir dire examination. *Jay*, ¶ 19. A court gives more weight to a prospective juror's "spontaneous statements" than to "coaxed recantations" elicited by counsel. *Jay*, ¶ 19.

¶20 A juror should not be removed merely because he voices a concern about being impartial. Every person comes to jury duty with preconceptions. *Jay*, ¶ 20. It falls within the discretion of the district court to decide whether a juror will be able to be impartial when a juror makes comments that suggest a fixed opinion, but later says he can set that opinion aside and follow the law. *Jay*, ¶ 20.

5

¶21 We reversed the district court in *State v. Freshment*, 2002 MT 61, 309 Mont. 154, 43 P.3d 968, for failing to dismiss two jurors for cause. The State charged Freshment with two counts of sexual intercourse without consent that involved two girls under age 16. The law provided that if Freshment reasonably had believed that the girls were 16 years old, the jury should acquit him of the charges. Defense counsel asked the potential jurors whether they could acquit Freshment if he had reasonably believed that the 15-year-old girls were actually 16 years old.

¶22 Juror Paula Porter admitted that she would "lean towards not following the law" if the law required acquittal under those circumstances. Porter also admitted that she "really couldn't" acquit under any circumstances. *Freshment*, ¶ 8. Juror James Hansen similarly stated that he did not know if he would acquit Freshment even if Freshment reasonably had believed that the girls were 16 years old. *Freshment*, ¶ 9. Both jurors stated an actual bias when they testified that they could not follow the law and acquit Freshment even if they found that Freshment reasonably had believed that the victims were 16 years old. *Freshment*, ¶ 16.

¶23 Champagne challenged potential juror Lamere for cause. Lamere had responded "yes" to a jury questionnaire that asked whether he preferred that a person charged with a crime prove his innocence. Lamere stated during voir dire that he would have reservations about a defendant not testifying. Defense counsel asked Lamere, "do you think if the Defendant didn't testify and chose not to, that suspicion arises? Do you think that maybe

6

that could happen?" Lamere responded, "[p]robably, yeah." Champagne moved to dismiss Lamere for cause.

¶24 The District Court responded to this motion by instructing Lamere on the law.

> [T]here is a presumption of innocence and the State has a burden of proving their case beyond a reasonable doubt. Part of that burden means that the Defendant does not have to testify. And if the Defendant does not testify I will instruct the jury that they are not to make any presumption or inference from that failure to testify.
> You have to decide whether the case has been proven based on the evidence that has been presented and not draw any negative inference from the Defendant's failure to testify. That is the law. Now, with that said, would you be able to follow the law, sir?

Lamere responded, "yes, ma'am." The District Court asked Lamere, "[a]nd you could follow the law and not draw any inference as to the Defendant's election not to testify?" Lamere responded, "I have never sat [on] a jury like that before, so I guess, you know, I'm not sure what to say. But I will follow the law, you know, not that I would go against the law. I don't understand a lot about the law, I guess."

¶25 The State asked Lamere whether he understood the presumption of innocence and a defendant's right not to testify. Lamere responded that he understood. Lamere also agreed with the State that there could be many reasons, unrelated to a person's guilt, that a person may choose not to testify. The District Court denied Champagne's motion to dismiss Lamere for cause.

¶26 The District Court possesses the ability to "look into the eyes of the juror in question" and to consider his responses in the context of the courtroom. *Jay*, ¶ 20. Lamere made comments to suggest that he would prefer that a defendant prove his innocence and that he

7

may draw a negative inference if a defendant chose not to testify. The District Court explained the presumption of innocence to Lamere and a defendant's right not to testify. Unlike the jurors in *Freshment*, who admitted that they may be unable to follow the law, Lamere readily admitted that he had been unfamiliar with the trial process and that he would follow the law as instructed by the court. *See Freshment*, ¶¶ 8-9. The District Court determined that Lamere's responses demonstrated his ability to remain impartial. We cannot say that the District Court abused its discretion under these circumstances.

¶27 *Whether Champagne's counsel provided ineffective assistance?*

¶28 Champagne argues that his trial counsel's failure to question Herdina about Herdina's affidavit constitutes ineffective assistance of counsel. Herdina stated in his affidavit that his employment as a law enforcement officer may affect his ability to remain impartial in a criminal case.

¶29 We first must determine whether Champagne properly presents allegations of ineffective assistance of counsel before this Court on direct appeal. *Upshaw*, ¶ 33; § 46-21-105(2), MCA. We look to whether the record contains an answer as to "why" counsel took, or failed to take, action in providing a defense. *Upshaw*, ¶ 33. Post-conviction proceedings represent the appropriate avenue for relief if the record does not fully explain "why" counsel acted or failed to act. *Upshaw*, ¶ 33. An exception to the requirement for a record-based answer arises when "no plausible justification" exists to counter a claim of ineffective assistance on appeal. *Upshaw*, ¶ 34.

8

¶30 The record provides no explanation as to "why" Champagne's counsel failed to inquire about Herdina's affidavit. Champagne argues that "no plausible justification" exists for this oversight. *Upshaw*, ¶ 34. The record does not establish whether Champagne's counsel even knew of the existence of Herdina's affidavit. Herdina did not mention any potential bias during voir dire. In fact, Herdina stated during voir dire that he felt that he could be fair to both the State and to Champagne.

¶31 Champagne's counsel's possible lack of knowledge regarding the affidavit creates a potential plausible justification for Champagne's counsel's failure to ask Herdina about his employment related bias. *See Upshaw*, ¶ 34. Further, Herdina explicitly stated during voir dire that he was not biased. We cannot say that "no plausible justification" exists for Champagne's counsel not to have questioned Herdina regarding his affidavit. *See Upshaw*, ¶ 34. A post-conviction proceeding represents the appropriate avenue for Champagne to bring his ineffective assistance of counsel claim.

¶32 *Whether the District Court abused its discretion in admitting the forensic interviewer's opinion testimony?*

¶33 Champagne argues that the District Court improperly allowed Matkin to offer an expert opinion although she was not qualified as an expert. The State argues that Matkin provided a lay opinion, rather than an expert opinion, that the District Court properly admitted under M. R. Evid. 701.

¶34 Champagne implied during cross-examination that J.B.'s testimony may have been coached. Matkin testified after J.B. Matkin testified that she had received training to

9

recognize whether a victim had been coached. The State asked Matkin, "[d]id you observe any indications of coaching in [J.B.'s] interview?" The District Court overruled Champagne's objection. Matkin responded, "[n]o, I did not."

¶35 A lay witness may testify to opinions or inferences that rationally relate to the perception of that witness and are helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. M. R. Evid. 701. A witness's training can provide a sufficient foundation for them to provide lay opinion testimony. For instance, in *State v. Frasure*, 2004 MT 305, ¶¶ 17-18, 323 Mont. 479, 100 P.3d 1013, we recognized that a police officer may testify as a lay witness to matters to which he has extensive training and experience. The police officer's training and experience in *Frasure* provided a sufficient foundation for the police officer to testify as to his lay opinion that the criminal defendant possessed drugs with the intent to sell the drugs. *Frasure*, ¶¶ 17-18.

¶36 The State elicited testimony from Matkin to demonstrate that Matkin had training to identify whether a victim had been coached. The State asked Matkin whether she had seen any indication that J.B. had been coached. The District Court properly allowed Matkin to testify about a matter to which she had training and experience: whether a victim had been coached. *See Frasure*, ¶¶ 17-18.

¶37 *Whether the District Court properly admitted J.B.'s prior consistent statements?*

¶38 Champagne further argues that the District Court improperly allowed Matkin and Falcon to testify about J.B.'s prior consistent statements. Montana Rule of Evidence 801(d)(1) provides that a party may admit a declarant's prior consistent statement if the party

10

offers it to rebut an express or implied charge that the declarant had fabricated her testimony or had acted from an improper influence or motive in testifying.

¶39     Four requirements must be met to admit a statement as a prior consistent statement. *State v. McOmber*, 2007 MT 340, ¶ 13, 340 Mont. 262, 173 P.3d 690.  First, the declarant must have testified at the trial.  *McOmber*, ¶ 13.  Second, the declarant must have been subject to cross-examination concerning her statement.  *McOmber*, ¶ 13.  Third, the prior statements to which the witness testifies must be consistent with the declarant's testimony at trial.  *McOmber*, ¶ 13.  Finally, the prior statement must rebut an express or implied charge of subsequent fabrication or subsequent improper influence or motive.  *McOmber*, ¶ 13.  In order to rebut a charge of subsequent fabrication or subsequent improper influence, the consistent statement must have been made before the motivation to fabricate a story arose, or before the improper influence occurred.  *McOmber*, ¶ 15.

¶40     The parties agree that J.B. testified at trial and that Champagne subjected J.B. to cross-examination.  The parties also agree that Falcon's and Matkin's testimony of J.B.'s prior statements comported with the testimony that J.B. had given at trial.  The parties further agree that Champagne had opened the door to prior consistent evidence testimony when he attempted to impeach J.B. by claiming that she possessed a motive to fabricate her story or that she was subjected to improper influence.  Champagne argues, however, that J.B. had made no prior consistent statements before the existence of the alleged motivation to fabricate.

11

¶41 J.B. testified that her mother had taken her to a doctor to see "if I still had my virginity." Champagne's counsel implied during cross-examination that J.B.'s testimony had been coached. Champagne's counsel suggested that "virginity" was a word that a twelve-year-old girl would not normally have in her vocabulary. Champagne's counsel asked J.B. whether she had spoken with a number of people about what had happened. J.B. admitted that she had talked to Falcon, to Matkin, to the County Attorney, and to her friend Brittany.

¶42 Champagne's counsel next inquired whether the County Attorney had told J.B. what to say. J.B. denied that the County Attorney had told her what to say. J.B. admitted that she and the County Attorney had gone over questions to be asked during her direct examination. J.B. further admitted that the County Attorney had told J.B. what to expect at the trial and on cross-examination by Champagne's counsel.

¶43 Champagne's counsel also asked J.B. whether Falcon, Matkin, or Brittany had told J.B. what to say. J.B. denied that any of them had told her what to say. Champagne's counsel pressed J.B. on her use of the word "virginity." Champagne's counsel stated, "I never heard you use that word in any of your other interviews. Did somebody tell you what that was?" J.B. responded, "No." Champagne's counsel remarked, "[o]kay. You have a good vocabulary then. Okay."

¶44 The District Court determined that Champagne had opened the door to prior consistent statement evidence. Champagne had suggested on cross-examination that the County Attorney, Matkin, or Falcon, had coached J.B. in her trial testimony. Falcon testified

12

about what J.B., then ten years old, had told her regarding the incident. Falcon's testimony of J.B.'s prior statements comported with J.B.'s testimony at trial. *See McOmber*, ¶ 13. The conversation between Falcon and J.B. took place before J.B. had spoken with either Matkin or the County Attorney. *See McOmber*, ¶ 15. J.B.'s statements to Falcon took place before any alleged coaching by Matkin or by the County Attorney could have occurred. *See McOmber*, ¶ 15.

¶45    Matkin also testified about what J.B., then ten years old, had told her. Matkin's testimony regarding J.B.'s prior statement comported with J.B.'s testimony at trial. *See McOmber*, ¶ 13. The conversation between Matkin and J.B. took place before J.B. had spoken with the County Attorney. *See McOmber*, ¶ 15. J.B.'s statements to Matkin took place before any alleged coaching by the County Attorney could have occurred. *See McOmber*, ¶ 15. The District Court properly admitted both Matkin's and Falcon's testimony of J.B.'s description of what had happened to her under M. R. Evid. 801(d)(1)(B), due to the fact that J.B. had made her statements to Matkin and Falcon before the alleged "improper influence" by the County Attorney. *See McOmber*, ¶ 15.

¶46    *Whether the District Court imposed an illegal sentence?*

¶47    Champagne argues that the District Court improperly considered Champagne's denial of guilt when it sentenced Champagne. We will not uphold a sentence where a district court draws a negative inference of lack of remorse as a result of a defendant's invocation of his constitutional right to remain silent and refusal to admit guilt. *State v. Morris*, 2010 MT 259, ¶ 22, 358 Mont. 307, 245 P.3d 512; *State v. Shreves*, 2002 MT 333, ¶ 24, 313 Mont. 252, 60

13

P.3d 991. The district court must have based its decision "in large part" on the defendant's lack of remorse or failure to take responsibility for this Court to reverse the sentence. *Shreves*, ¶ 24; *see also Morris*, ¶ 23.

¶48 The district court in *Morris* provided eight valid reasons for the sentences, none of which relied on lack of remorse or lack of accountability. *Morris*, ¶ 23. The district court in *Shreves*, in contrast, based its sentence and parole restriction, in large part, on his failure to show remorse or to take responsibility for the deliberate homicide for which he had been convicted. *Shreves*, ¶¶ 7, 24.

¶49 Here the District Court announced in the judgment that, "Defendant has no empathy for the victim and he has even projected blame on to the victim." The District Court further pointed to Champagne's four prior felony convictions, his "extensive chemical dependency history," and Champagne's diagnosis as a psychopath. The District Court noted that Champagne "possesses several psychopathic qualities; he is callous and predatory, deceptive and manipulative, he lacks empathy and does not feel genuine remorse for his socially deviant and criminal acts. [Champagne's] prospects at rehabilitation are slim." The District Court further noted that Champagne had been supervised by the Department of Corrections "in one form or another almost his entire adult life." We cannot say that the District Court based its sentencing decision "in large part" on Champagne's denial of guilt under these circumstances. *See Shreves*, ¶ 24; *Morris*, ¶ 23.

¶50 Further, a district court may sentence a defendant based on lack of remorse so long as affirmative evidence of the lack of remorse exists. *Morris*, ¶ 22. The District Court noted

14

that Dr. Michael Scolatti's psychological evaluation portrayed Champagne as a person who is "lacking in empathy and does not feel genuine remorse for socially deviant and criminal acts. He usually does not feel guilt when he hurts, takes advantage of, or otherwise abuses other people." Dr. Scolatti further opined that Champagne "evidences little or no empathy for the victim." The record does not support Champagne's claim that the District Court improperly drew a negative inference from Champagne's denial of guilt. *See Shreves*, ¶ 14; *Morris*, ¶ 22.

¶51    Champagne next argues that the District Court's imposition of unspecified restitution costs represents an illegal sentence. The District Court required Champagne to pay restitution to J.B. The District Court recognized that J.B. may need additional and ongoing treatment. The District Court ordered Champagne to cover these future, unknown costs. The State admits that Montana law requires restitution obligations to be imposed in "a specified amount." *Heafner*, ¶ 13. We remand to the District Court to set a specified amount for restitution for future costs. *See Heafner*, ¶ 13.

¶52    Champagne also challenges the District Court's recommended conditions "[f]or any term of community supervision." The District Court possesses authority to make non-binding recommendations to the Department of Correction's Board of Pardons and Parole as part of its judgment. *Heafner*, ¶ 13. Champagne admits that this Court need not determine the legality of the District Court's order if the District Court merely made non-binding recommendations.

¶53    We affirm in part, reverse in part, and remand.

15

/S/ BRIAN MORRIS

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT